

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00115-CR

_____


DESMOND DEWAYNE JACKSON, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 36,414-A



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

During Desmond Dewayne Jackson's six-day jury trial for capital murder arising from a robbery and shooting of Melvin Brad Mitchell in the parking lot outside Cash America Pawn in Longview, the State spent approximately two and a half days, on rebuttal, providing evidence that, as an extraneous offense, Jackson committed an armed robbery of a Kroger grocery store in Marshall approximately a month after the charged murder. Though the State does not claim that the Kroger robbery is so similar to the pawn shop murder as to be a "signature" crime, it maintains that proof of the Kroger robbery was admissible to prove identity or intent or to rebut a defensive theory.

Jackson appeals his conviction and sentence of life imprisonment without parole, raising thirteen issues. We reverse Jackson's conviction and remand for a new trial, because we hold that, although (1) the evidence is legally and factually sufficient, (2) admitting evidence of the Kroger robbery was reversible error.[1]

*(1)    The Evidence Is Legally and Factually Sufficient*

A person commits capital murder if he or she intentionally commits murder while in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2), 29.02 (Vernon 2003). Jackson claims the State failed to prove he was involved in the crime and failed to prove the requisite intent.

---

[1]Because we conclude the error in admitting the extraneous-offense evidence was reversible error, it is not necessary to address Jackson's remaining issues.

2

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).

The State presented sufficient evidence for a reasonable jury to conclude, beyond a reasonable doubt, that Jackson was guilty.

On the morning of Monday, December 10, 2007, Mitchell, an employee of the pawn shop, arrived at the bank to make a number of deposits and with a change order of $400.00 for Monday's business. Due to an error in Friday's deposit, the bank sent Mitchell back to the pawn shop with Friday's deposit. Mitchell left the bank with approximately $8,884.00. After Mitchell had parked his truck, but before he entered the store with the bank bag,[2] Mitchell was robbed and shot.

---

[2] All of the witnesses except Ruth Walter testified Mitchell had not entered the pawn shop. Walter, though, testified Mitchell had entered the shop and then returned to the parking lot.

Three witnesses to the shooting testified at trial. While leaving a nearby grocery store with her friend, Maria Hernandez, Tammy Renee Flores saw a man run from the front of the pawn shop, hit the pickup truck which set off the truck's alarm, run between the Plasma Center and the retaining wall, and then run up the hill beside the E-Z Mart, a convenience store. Flores testified she did not think anything out of the ordinary had occurred and proceeded to a nearby "Spanish store on Green Street." Upon leaving the store on Green Street, Flores observed police cars at the pawn shop and stopped to report her observations.

Hernandez testified she heard screaming and then saw a man running with a gun in his hand.

Walter, who was cleaning a State Farm Insurance office located across the street "at an angle," observed Mitchell go to the door of the pawn shop, enter the pawn shop, come back out, and go to the side of the building. Walter then observed an African-American person wearing a "red hoodie" run from behind the Plasma Center across the parking lot, observed the person stop in the parking lot "maybe just a second," and then heard a gunshot. After the gunshot, Walter observed the person run behind the building in the same direction the person had come from. Walter was unable to tell whether the person was a male or female.

Cyrus Dean, the manager of the pawn shop, heard some shouting outside the shop and went to the front window to look out. Dean observed Mitchell lying on the ground between his parked truck and the building. The alarm on Mitchell's pickup truck had been activated. Thinking

4

Mitchell may have fallen, Dean rushed to Mitchell's side and discovered Mitchell had been shot. Mitchell told Dean that he had been shot by "a tall, slender black dude wearing a red top." While Dean and Mitchell were waiting on the ambulance, Mitchell also expressed a concern that, if the paramedics did not get there soon, he was going to die.

Officer Danny Stroud, a police officer with the Longview Police Department, arrived at the scene a few minutes before the ambulance. Stroud testified Mitchell appeared to be scared and kept saying, "Please hurry. Please hurry. It hurts." Mitchell informed Stroud that the man who shot him had come from behind the dumpsters.

Dr. Keith Pinckard, a medical examiner for Southwestern Institute of Forensic Sciences, testified Mitchell died from a gunshot wound to the chest.

Officer Kirby DeLoach, a police officer with the Longview Police Department, tracked the suspect with a certified tracking dog. The tracking dog lost the scent in a parking lot of a church located at Birdsong and Baxter Avenues. DeLoach noticed a spot of water in the parking lot of the church consistent with a spot of water created by a car's air conditioning unit. DeLoach presumed that the suspect got into a car in the church parking lot.

Within hours of the robbery, Cash America Pawn offered a $20,000.00 reward for "information leading to the arrest and indictment of the individual(s) responsible for the robbery/murder of Melvin 'Brad' Mitchell." On or about January 18, Detective Douglas Brinkley, a detective with the Criminal Investigation Division of the Longview Police

5

Department, received a call from Ladarian Beechum. Beechum informed Brinkley that her brother, Robert Blaylock, had some information for him concerning the pawn shop robbery. Brinkley interviewed Blaylock, who lived in Atlanta, Georgia, by telephone and then traveled to Atlanta to interview Blaylock in person. Shortly before Christmas, while Jackson and Blaylock were drinking and playing a video game, Jackson admitted to Blaylock that Jackson had killed a man with a ".45." Blaylock denied being drunk. According to Blaylock, Jackson stated he knew the guy's routine of going to the bank in the morning and returning with money for the day. Jackson stated he stole approximately $8,000.00 and had fled through some woods. Blaylock admitted he had received the $20,000.00 reward from Cash America Pawn. Blaylock also admitted he had previously lied under oath about his finances on an application for a court-appointed attorney.

James Roberson, Jackson's accomplice in the Kroger robbery, testified Jackson admitted that "[h]e robbed a guy, and he [had] shot him" because "[h]e wouldn't give him the money." Roberson testified he could not remember the details other than the victim was an older white man.

The Longview police searched Jackson's house a total of three times. The first search was conducted pursuant to the consent of Francis Jackson, Jackson's wife. During the search, the police seized a .32 caliber pistol, a .45 caliber automatic pistol, a box of .45 caliber Federal brand shells, twenty rounds of .45 caliber Blazer brand shells, and nine rounds of .45 caliber Remington brand shells. The second search was conducted pursuant to search warrant. The third search was

6

conducted based on the consent of Lanie Smith, who had accepted a deed to the house in lieu of foreclosure.[3] During this search, the police seized a .45 caliber Remington brand shell casing, which was found on the ground behind an air conditioning unit.

An analysis of the items seized provided a few links between the items and the pawn shop murder. Wade Thomas, a forensic scientist for the Texas Department of Public Safety, testified that State's Exhibit #19B, a shell found at the scene of Mitchell's murder, and State's Exhibit #30, the shell found in the third search of Jackson's house, were fired from the same gun. However, Thomas testified that tests to determine whether the shells were fired by the .45 caliber pistol seized at Jackson's house were inconclusive.[4] Thomas testified the shells seized at Jackson's house had similar bunting markings as the shells found at the scene, supporting the conclusion that they were probably made at or near the same time. Thomas admitted on cross-examination that the same machine could make between 40,000 and 180,000 shells with the same bunting marks.

The State introduced business records from Delta Airlines which indicate Jackson flew from Atlanta to Dallas December 6, 2007, and returned to Atlanta December 11, 2007. In

---

[3]The Jacksons had purchased the home from Smith, a Longview police officer. The home was owner financed by Smith and the Jacksons gave Smith a deed to the home in lieu of foreclosure. Smith then consented to the third search. Smith testified that he did not participate in the investigation and that no one suggested to Smith that he "need[ed] to hurry up and get Mrs. Jackson or Mr. Jackson out of that property so that [the police] can get down there and search it again."

[4]Thomas testified his notes "indicate a possible elimination," but he classified the test as "inconclusive" because the pistol "wasn't collected until well after the offense date" and "the firearm could have been altered between the time of offense and time of collection." Richard Ernest, the defense expert, testified the .45 caliber pistol was "well worn," but testified thousands of rounds would probably be needed to wear the rifling out and it would be very unlikely for that many bullets to be fired in a month and a half.

7

addition to the plane flights, the State presented evidence that Jackson had lied to the police about his whereabouts on the day of the crime,[5] and Jackson's wife had some poorly explained absences from work on the day of the crime.[6] Blaylock testified Jackson claimed to have called his wife to pick him up.

The evidence is legally sufficient. "Because it is difficult to prove what a defendant was thinking, intent of the accused is not ordinarily determined by direct proof; rather, it is inferred from circumstantial evidence." *Morris v. State*, 892 S.W.2d 205, 207 (Tex. App.—Texarkana 1994, no pet.). "Intent may be inferred from acts, words, or conduct of an accused, including the circumstances surrounding the acts in which the accused engages." *Id.* Considering the evidence in the light most favorable to the verdict, a rational trier of fact could have found, beyond a reasonable doubt, the essential elements of capital murder.

Jackson did present some contrary evidence. Ernest, Jackson's expert, testified the .45 caliber pistol seized at Jackson's residence did not fire the shells contained in State's Exhibits #19B and #30. Ernest testified, "[I]t's my opinion that this particular gun is making an entirely different set of markings than these two cartridge cases . . . ." The shell found in the third search

[5]At one point, Jackson claimed he was in Georgia when the offense was committed. Later, Jackson claimed he had visited a cousin on the day of the offense. The cousin denied he had seen Jackson since Thanksgiving 2007. Jackson's statements are contradicted by the airline records. In addition, Dana Dessesaure, an employee at the daycare which cared for Jackson's children, testified Jackson picked up his children around 2–2:30 on the day of the murder.

[6]Francis Jackson left her job at approximately 9:00 a.m. to take diapers to her children's daycare. Francis returned at 10:12 a.m., but left again at 10:56 a.m. to do field work for her company. Although the field work should have only taken half an hour and her lunch break was only one hour, she did not return for two and a half hours. After making a call around 1:54 p.m., Francis left for the rest of the day to deal with a family emergency.

8

should have been exposed to the elements since it was found outside close to the air conditioner. Ernest testified the shell seized in the third search was "bright and shiny" and does not appear to have "any corrosion to it, doesn't have any significant weathering to it." Ernest also testified there were a few grains of sand ("but not much") on the inside of the shell and it did not appear to have been cleaned in any significant manner. Ernest conducted a test to determine whether the weathering on the shell was consistent with being exposed to the elements.[7] Based on this test, Ernest opined that the shell could not have been exposed to the elements for more than three days. The State recalled Thomas, who testified he had cleaned the dirt off the shell with water and a cotton swab, but admitted the shell did not have any apparent corrosion. At trial and on appeal, Jackson argues the condition of the shell casing indicates it may have been planted by some unknown third party.

James Stewart, a friend of Mitchell, testified he overheard a conversation at a gas station which made him believe the men might know something about the murder. The conversation was between a heavyset black man and a tall, skinny, black man who was about 5'9" and had a tattoo on his left upper forearm. Stewart later picked out a man named Bruce Kelly from a photographic lineup. Naomi Martinez, a co-worker of Francis, testified she received a telephone call from

---

[7]The record contains no details concerning the similarity of this test to the conditions to which the shell was exposed at the scene.

9

Francis around 9:00 a.m. and the background noise sounded like what one would hear in a store like Super 1 or Wal-Mart.[8]

The evidence is factually sufficient. The evidence supporting the conviction is not "too weak" to support the jury's verdict and the jury's verdict is not against the great weight and preponderance of the evidence.[9]

---

[8]Francis had claimed to be purchasing diapers during her first absence from work on the day of the pawn shop murder.

[9]Jackson also argues the State was required to corroborate the testimony of Roberson under the accomplice-witness rule. The State fails to respond to Jackson's accomplice-witness argument. In addressing this argument, we start by pointing out that Roberson was not complicit in the offense being tried—the pawn shop murder—but he was Jackson's accomplice in the extraneous offense—the Kroger robbery. Separating the two offenses for this analysis is important, because Roberson provided testimony relevant to both the pawn shop murder and the Kroger robbery. Because Roberson was not an accomplice in the pawn shop murder, Roberson's testimony regarding the murder need not be corroborated. Because there is sufficient corroboration of Jackson's involvement in the extraneous offense, we need not decide whether Roberson's testimony as to the extraneous offense must be corroborated.

Under the accomplice-witness rule, one cannot be convicted on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the offense charged. TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). The test for weighing the sufficiency of corroborating evidence is to eliminate from consideration the accomplice's testimony and then examine the remaining testimony and evidence to determine if there is evidence that tends to connect the defendant with the commission of the offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). To determine the sufficiency of corroboration, we must view the corroborating evidence in the light most favorable to the jury's verdict. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).

Roberson was not an accomplice in the pawn shop murder. "Commission of a different 'downstream' offense, even with knowledge of the prior criminal act charged against the defendant" is insufficient to make a witness an accomplice witness. *Tucker v. State*, 689 S.W.2d 235, 237 (Tex. App.—El Paso 1985, pet. ref'd). Although there is sufficient evidence independent of Roberson's testimony that tends to connect Jackson to the pawn shop murder, Roberson was not an accomplice to the pawn shop murder, and corroboration of Roberson's testimony concerning the pawn shop murder was not required.

On the other hand, Roberson was an accomplice as a matter of law in the Kroger robbery, because he had been indicted for the Kroger robbery. *See Goff v. State*, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996); *Badillo v. State*, 963 S.W.2d 854, 857 (Tex. App.—San Antonio 1998, pet. ref'd). None of the cases cited by Jackson involve witnesses who were accomplices to an extraneous offense. "Whether the rule applies to accomplice witness testimony concerning extraneous offenses properly proved by the State at the guilt-innocence stage has not been resolved." 43 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 31.253 (West 2001); *see Rice v. State*, 605 S.W.2d 895, 903 (Tex. Crim. App. [Panel Op.] 1980) (op. on reh'g) (declining to decide issue).

*(2)*     *Admitting Evidence of the Kroger Robbery Was Reversible Error*

Jackson claims the trial court erred in admitting evidence concerning an extraneous offense.   We agree.

The trial court admitted extensive evidence concerning the Kroger robbery, including more than two days of additional testimony.   The State argues the extraneous offense was admissible to prove identity, to prove intent, or to rebut a defensive theory.

The Texas Rules of Evidence provide the basic framework of our analysis on the issue of whether an extraneous offense is admissible.   Evidence is "relevant" that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   TEX. R. EVID. 401.   "All relevant evidence is admissible, except as otherwise provided by . . . these rules . . . .   [E]vidence which is not relevant is inadmissible."   TEX. R. EVID. 402.   Rule 404 provides:   "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."   TEX. R. EVID. 404(b).   Evidence of "other crimes,

---

If the accomplice-witness rule were to apply to the extraneous offense, the State would be required to establish sufficient corroboration of Roberson's testimony to connect Jackson to the Kroger robbery.   Roberson's testimony concerning the Kroger robbery was corroborated by Jackson's admission to Blaylock that Jackson had committed that robbery, the shell casing found at the Kroger store and matched to the gun found at Jackson's house, and the DNA analysis conducted on a hat left at the scene of the Kroger robbery by the suspects and containing DNA that did not exclude Jackson, but did exclude 99.98 percent of others in the population.   The nonaccomplice evidence does not have to directly link the accused to the crime, does not have to establish guilt beyond a reasonable doubt, and need not prove all the elements of the alleged offense.   *Gill*, 873 S.W.2d at 48; *Munoz*, 853 S.W.2d at 559.   The nonaccomplice evidence tends to connect Jackson with the Kroger robbery.   The corroboration of the accomplice testimony was sufficient as to the extraneous offense.

11

wrongs or acts" may be admissible if it has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b).

The permissible "purposes" to which evidence of "crimes, wrongs, or acts" may be put include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b). Extraneous-offense evidence that logically serves any of these purposes is "relevant" beyond its tendency "to prove the character of a person in order to show action in conformity therewith" and subject only to the trial court's discretion nevertheless to exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." TEX. R. EVID. 403, 404(b).

An accused must be tried only for the offense with which he or she is charged. The accused may not be tried for a collateral crime or for being a criminal generally. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991).

> Generally, evidence of extraneous offenses may not be used against the accused in a criminal trial . . . . While such evidence will almost always have probative value, it forces the defendant to defend himself against uncharged crimes as well as the charged offense, and encourages the jury to convict a defendant based upon his bad character, rather than proof of the specific crime charged.

*Daggett v. State*, 187 S.W.3d 444, 450–51 (Tex. Crim. App. 2005) (footnotes omitted). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.* at 451 n.13 (citing TEX. R. EVID.

404(b)).  Extraneous-offense evidence is admissible only if the evidence satisfies a two-pronged test:   (1) the extraneous-offense evidence must be relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character; and (2) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.  *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).   Unfair prejudice does not arise from the mere fact that evidence injures a party's case.   Unfair prejudice may result from the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant.   *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard.   *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).   A trial court does not abuse its discretion so long as the decision to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).   An appeals court may not substitute its own decision for that of the trial court.   *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

We will address each of the State's arguments and then, since we find the extraneous-offense evidence was erroneously admitted, address whether the error resulted in harm.

13

*(a)    The Extraneous-Offense Evidence*

After Jackson rested, the State offered rebuttal evidence concerning the extraneous offense at issue—the Kroger robbery.   In an effort transcribed onto almost 250 pages of reporter's record, fifteen witnesses testified concerning the extraneous offense, extending the trial an additional two and a half days.   In addition, the State offered approximately seventeen additional exhibits, including video and audio recordings of police interrogations which were admitted into evidence. And, we note, the vast majority of that Kroger robbery evidence was presented after a weekend break and in the same week the jury deliberated and rendered its verdict.

Detective Brinkley testified that Blaylock had provided him with information concerning another crime in which Jackson had been involved—the robbery of a Kroger grocery store in Marshall, Texas.   Blaylock testified Jackson had claimed the Kroger robbery "was an inside deal with some guy that worked there, a manager."   According to Blaylock, Jackson admitted to wearing a wig and acting like a shopper.   When Blaylock showed Jackson a video recording of the robbery that had been posted on the internet, Jackson referred to the gun in the video and said, "[T]hat's my baby; that's that forty-five."   Jackson told Blaylock he had stolen $17,000.00 and it had been split three ways.

Helen Baird, an employee of Kroger, testified she and Roberson were robbed by two armed men who came into the cash room of the Kroger.   Baird, though, was not asked to make an in-court identification of Jackson.   The State recalled Roberson, who testified he was Jackson's

14

accomplice in the Kroger robbery. Roberson described how he and Jackson planned and executed the robbery. Roberson testified Jackson provided him with approximately $3,500.00 for his share of the stolen cash.

The State also presented scientific evidence linking Jackson to the Kroger robbery. Thomas, the State's firearm expert, was recalled and testified that shell casings collected by the Marshall Police Department at the scene of the Kroger robbery were fired from the .45 caliber pistol seized at Jackson's house. Constance Patton, a forensic scientist from the Tarrant County Medical Examiner laboratory, testified a hat recovered at the scene of the Kroger robbery had a mixture of DNA from three men on it. Jackson could not be excluded as a possible contributor of the DNA. Patton testified "99.98 percent of random unrelated individuals in the Caucasian, African-American, and Southwestern Hispanic populations would be excluded as possible contributors to the ball cap mixture."

*(b)*        *Similarity of Offenses*

When the extraneous offense is introduced to prove identity, the extraneous offense must be so similar to the charged offense that the offenses illustrate the defendant's "distinctive and idiosyncratic manner of committing criminal acts." *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005); *see Owens v. State*, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992). The common characteristics of each offense must be so unusual as to act as the defendant's "signature." *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996). "No rigid rules

15

dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008). "Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual." *Id.* In the context of evaluating the admissibility of extraneous offenses, *modus operandi* refers to "a defendant's distinctive and idiosyncratic manner of committing criminal acts." *Owens*, 827 S.W.2d at 914.

In *Hartsfield*, this Court held an extraneous offense was admissible to prove identity when the offenses occurred in the same geographic area, were committed three days apart and at night, were committed with accomplices, and the perpetrators first emptied the cash register and then rifled through the shelves beneath the cash register at both locations. *Hartsfield v. State*, 305 S.W.3d 859, 872 (Tex. App.—Texarkana 2010, pet. filed). *Hartsfield*, though, is distinguishable from the current case. The Kroger robbery occurred inside the store by two persons with a third accomplice who worked at the store. The pawn shop murder was committed in the parking lot of the pawn shop by a single person without any inside accomplice. The clothing of the suspects differed. The suspects in the Kroger robbery wore wigs and disguises, while the sole suspect in

16

the pawn shop murder did not.[10]   The pawn shop murder and the Kroger robbery were committed a month apart, rather than the three days between the offenses in *Hartsfield*.

In essence, the only similarities between the pawn shop murder and the Kroger robbery are that both offenses were armed robberies committed with a .45 caliber pistol.   The State has failed to direct this Court to any details, insignificant or otherwise, which would mark the crime as the *modus operandi* of a single individual.   The mere fact that both offenses were armed robberies does not make them sufficiently similar to prove identity.   "The State must show more than the mere repeated commission of crimes of the same type or class . . . ."   *Owens*, 827 S.W.2d at 915. We see no similarities that indicate a distinctive and idiosyncratic manner of committing criminal acts.   Evidence concerning the Kroger robbery was not relevant to the issue of identity.   As stated by the Texas Court of Criminal Appeals:   "if extraneous offense evidence is not 'relevant' apart from supporting an inference of 'character conformity,' it is absolutely inadmissible under Rule 404(b)."   *Montgomery*, 810 S.W.2d at 386–87.   This decision is outside the zone of reasonable disagreement.   The trial court abused its discretion in admitting the evidence of the Kroger robbery to prove identity.

*(c)     Proving Intent?*

Although the extraneous-offense evidence was not admissible on the issue of identity, we must still consider whether the extraneous evidence was admissible to establish intent.   Intent can

---

[10]While the State contended that the hooded sweatshirt worn at the pawn shop was a disguise, we do not find that contention compelling.

17

be inferred from acts, words, and conduct of the accused.  *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991).   The State argues the extraneous offense was admissible to establish Jackson had the requisite intent.   The State claims the extraneous offense shows Jackson intended to kill Mitchell because Mitchell resisted and no one was killed at the Kroger robbery where no one resisted.

Jackson argues the defense "never put intent at issue."   We agree.   During the trial, Jackson never contested or attempted to refute the State's evidence concerning intent.   Jackson's defensive theory was that the State failed to prove he was the person who committed the crime. The only evidence which would contest intent was the testimony of Blaylock, that Jackson said killing Mitchell "wasn't something that I was trying to do, but, you know, I didn't have no choice." Blaylock's testimony was introduced by the State on direct examination.

The State argues Jackson contested intent by discussing the intent requirement during voir dire.   We are not persuaded by this argument.   Jackson did not contest intent by discussing the issue during voir dire.   The State has failed to direct this Court to where in the record Jackson placed intent at issue.   When the State's evidence on intent "is uncontradicted by the defendant or not undermined by cross-examination of the State's witnesses, the offer of other crimes is unjustified due to the lack of relevancy."   *Rankin v. State*, 974 S.W.2d 707, 719 (Tex. Crim. App. 1996) (op. on reh'g); *DeLeon v. State*, 77 S.W.3d 300, 312 (Tex. App.—Austin 2001, pet. ref'd).

18

Because Jackson never contested intent, the extraneous-offense evidence was inadmissible under Rule 404. *See* TEX. R. EVID. 404.

Even if Jackson had contested intent, the probative value of the offense is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Our analysis is guided by the following factors known as the *Montgomery* factors: (1) how compellingly the extraneous-offense evidence serves to make a fact of consequence more or less probable; (2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way"; (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the force of the proponent's need for this evidence to prove a fact of consequence, that is, does the proponent have other probative evidence available to him or her to help establish this fact, and is this fact related to an issue in dispute. *Montgomery*, 810 S.W.2d at 389–90; *see Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); *Hartsfield*, 305 S.W.3d at 873.

The first factor weighs slightly against the admission of the extraneous offense. The State argues the Kroger robbery is probative of intent in the pawn shop murder because no one died in the Kroger robbery where no one resisted. The State argues that Mitchell resisted in the pawn shop robbery and, therefore, the Kroger robbery establishes that the actor intended to cause the death of Mitchell during the pawn shop robbery. While this argument has some logic, the argument is extremely tenuous. It requires a rather large inference to be made by the jury. The

19

probative value of the Kroger robbery concerning intent is, at best, extremely marginal. Thus, the Kroger robbery is not terribly compelling in making a fact of consequence more or less probable.

The second factor weighs heavily against the admission of the extraneous offense. Although the extraneous-offense evidence was accompanied by an instruction of its limitations, the evidence had to impress the jury "in some irrational but nevertheless indelible way." While all extraneous offenses are inherently prejudicial, we believe this extraneous offense is unusually prejudicial. Rule 403 does not exclude all prejudicial evidence, but only evidence where the probative value is substantially outweighed by the danger of unfair prejudice. The Kroger robbery had significant potential "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *See Old Chief v. United States*, 519 U.S. 172, 180 (1997). The jury was presented with evidence that Jackson committed a second armed robbery approximately a month after the pawn shop murder. Thus, the Kroger robbery had substantial potential to convince the jury that Jackson was a criminal in general and, therefore, probably committed the charged offense.

The third factor weighs heavily against the admission of the extraneous offense. The time needed to develop the evidence was substantial. The State's rebuttal consumed approximately two and a half days of a six-day trial. The State called fifteen witnesses and introduced seventeen exhibits. During this entire time, the jury was distracted from consideration of the indicted offense.

20

The remaining factor also weighs heavily against the admission of the extraneous-offense evidence to prove intent. As noted above, intent was not a significant dispute at trial—if it was even disputed at all. A jury could reasonably infer intent from the evidence introduced concerning the pawn shop murder. In essence, the State had no need for this evidence to prove a fact of consequence.

All of the factors weigh against the admission of the extraneous-offense evidence to prove intent. Three of these factors weigh heavily against its admission. The State had no need for the evidence to prove intent, the time needed to develop the evidence was substantial, and the evidence had significant potential to impress the jury "in some irrational but nevertheless indelible way." Even if the evidence was relevant, the probative value of the offense is substantially outweighed by the danger of unfair prejudice. This decision is outside the zone of reasonable disagreement. The trial court abused its discretion in admitting the evidence of the Kroger robbery to prove intent.

*(d)*      *Rebutting a Defensive Theory Is Not in Issue*

The State alternatively argues the extraneous offense was admissible to rebut defensive theories.[11] The trial court, though, instructed the jury it could not consider the extraneous evidence:

---

[11]The State argues, because the defense impeached Blaylock with the evidence that he received a $20,000.00 reward, the Kroger robbery was admissible to show Blaylock was willing to testify concerning the Kroger robbery despite not receiving a reward. Alternatively, the State argues the Kroger robbery was admissible to explain a typographical error in the search warrant which authorized the third search of Jackson's residence.

21

FOR ANY PURPOSE UNLESS YOU FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT COMMITTED SUCH OTHER OFFENSES, IF ANY WERE COMMITTED, AND EVEN THEN YOU MAY ONLY CONSIDER SUCH EVIDENCE IN DETERMINING **THE INTENT OR THE IDENTITY** OF THE DEFENDANT IN RELATION TO THE OFFENSE ON TRIAL, AND YOU MAY NOT CONSIDER THESE OFFENSES FOR ANY OTHER PURPOSE.

(Emphasis added.) The Texas Court of Criminal Appeals has held that an appellate court cannot affirm a trial court's decision to admit extraneous-offense evidence to rebut a defensive theory if the trial court failed to instruct the jury, in the trial court's limiting instruction, on the extraneous evidence admissibility to rebut a defensive theory. *Owens*, 827 S.W.2d at 917; *see Curtis v. State*, 89 S.W.3d 163, 171 (Tex. App.—Fort Worth 2002, pet. ref'd) (refusing to consider whether admission of extraneous-offense evidence to rebut defensive theory was proper because jury was not instructed on that basis). The Texas Court of Criminal Appeals held, "[a]bsent such additional instruction, there is no way for an appellate court to know whether the jury properly applied the evidence of appellant's 'system' to rebut the weight or credibility of appellant's 'frame-up' theory or relied on it for an improper basis such as character conformity." *Owens*, 827 S.W.2d at 917. Here, the jury was not instructed that it could consider the extraneous-offense evidence to rebut a defensive theory. As such, we cannot consider whether the extraneous-offense evidence was admissible to rebut a defensive theory. The trial court erred in admitting the evidence concerning the Kroger robbery.

*(e)     Harm*

The next step in our analysis is to determine whether the error resulted in harm.   Error in admitting evidence concerning extraneous offenses is reviewed under Rule 44.2(b) of the Texas Rules of Appellate Procedure.  *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007) (finding under Rule 44.2(b) the error in admitting photographs was harmless).   Rule 44.2(b) provides that an appellate court must disregard a nonconstitutional error that does not affect a criminal defendant's "substantial rights."   TEX. R. APP. P. 44.2(b).   An error affects a substantial right of the defendant when the error has a substantial and injurious effect or influence in determining the jury's verdict.  *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).   A criminal conviction will not be reversed for nonconstitutional error if the appellate court, after examining the record as a whole, "has fair assurance that the error did not influence the jury, or had but a slight effect."[12]   *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

---

[12]We note that, on at least two occasions, the Texas Court of Criminal Appeals has applied the "grave doubts" analysis instead of the "fair assurance" analysis.  *See Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002); *Ford v. State*, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002); *see also Aguirre-Mata v. State*, 125 S.W.3d 473, 487 (Tex. Crim. App. 2003) (Holcomb, J., dissenting).   Under this analysis, which is roughly equivalent to the "fair assurance" analysis, the error is reversible if the court has "grave doubts" about whether an error did not affect the outcome.  *See Burnett*, 88 S.W.3d at 637; *see also O'Neal v. McAninch*, 513 U.S. 432, 434 (1995).   "Grave doubt" means "in the judge's mind, the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error."  *O'Neal*, 513 U.S. at 434; *Burnett*, 88 S.W.3d at 637.   The "grave doubts" analysis would result in the same conclusion as the "fair assurance" analysis.   Despite the substantial evidence of guilt, we entertain grave doubts concerning whether the evidence did have a substantial or injurious influence on the jury.   While the evidence of guilt favors a finding of harmless error, the character of the erroneously-admitted evidence and its connection to the other evidence favors a finding of harm.   Our balancing concludes these factors are so evenly balanced that the decision regarding the harmlessness of the error is in "virtual equipoise."   Because we have grave doubts concerning whether

23

In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. The reviewing court might also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments and even voir dire, if material to appellant's claim.

*Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla*, 78 S.W.3d at 355.

The State argued at oral argument that the error was harmless because the trial court gave a limiting instruction before the State presented the extraneous-offense evidence and the court's instructions to the jury contained a limiting instruction. We are not convinced that the limiting instruction rendered the error harmless.

The Amarillo Court of Appeals addressed a similar argument in *Bjorgaard v. State*, 220 S.W.3d 555, 562 (Tex. App.—Amarillo 2007), *pet. dism'd, improvidently granted*, 253 S.W.3d 661 (Tex. Crim. App. 2008). In that case, the appellant was charged with attempted sexual assault of his ten-year-old niece. *Id.* at 558. The State introduced evidence that the appellant had previously been convicted of indecency with a child. *Id.* After determining the evidence should not have been admitted, the Amarillo court concluded that, even "if the jury did heed the trial court's admonishment, the admonishment itself could be viewed as permitting consideration of the evidence for an improper purpose." *Id.* at 562. As discussed above, the Kroger robbery should not have been admitted to prove either identity or intent in the pawn shop murder. Thus, the

the evidence did have a substantial or injurious influence, the error in admitting the extraneous evidence resulted in harm.

24

limiting instruction instructed the jury it could consider, albeit for a limited purpose, evidence it should not have considered. An instruction, which instructs a jury to consider inadmissible evidence for a limited purpose, still instructs a jury to consider inadmissible evidence. The evidence should not have been considered for any purpose during the guilt/innocence phase of the trial. The limiting instruction does not render the error harmless.

In conducting a harm analysis, the presence of overwhelming evidence of guilt can be a factor in the evaluation of harmless error. *Motilla*, 78 S.W.3d at 357. Jackson admitted to Blaylock that he had committed the pawn shop murder. Jackson admitted to Blaylock that he had studied the victim's routine of going to the bank in the morning and returning with money and that he had killed the man with a ".45." Jackson stated he stole approximately $8,000.00 and had fled through some woods. Roberson testified Jackson admitted "[h]e robbed a guy, and he [had] shot him" because "[h]e wouldn't give him the money." Shells seized during the first search of Jackson's house had similar bunting markings as the shells found at the scene. Jackson flew from Atlanta to Dallas December 6, 2007, and returned to Atlanta December 11, 2007. Jackson's wife had some poorly explained absences from work on the day of the crime. Jackson lied to the police on a number of occasions concerning his whereabouts on the day of the crime. Last, the shell casing found during the third search of Jackson's house was fired from the same gun as a shell casing found at the scene of the pawn shop murder. Although there is substantial evidence of

25

guilt, the evidence is not overwhelming. The evidence of guilt weighs in favor of a finding that the error did not influence the jury, but is not the sole factor in our analysis.

The Texas Court of Criminal Appeals has stressed "an appellate court should consider overwhelming evidence of guilt, but that that should be only one factor in the analysis." *Id.* at 357. Other relevant factors in a harm analysis are "'the character of the alleged error and how it might be considered in connection with other evidence in the case.'" *Id.* at 359 (quoting *Morales*, 32 S.W.3d at 867).

The character of the erroneously-admitted evidence weighs heavily in favor of a finding of harm. "Extraneous-offense evidence is 'inherently prejudicial, tends to confuse the issues, and forces the accused to defend himself against charges not part of the present case against him.'" *Sims v. State*, 273 S.W.3d 291, 294–95 (Tex. Crim. App. 2008) (quoting *Pollard v. State*, 255 S.W.3d 184, 185 (Tex. App.—San Antonio 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009)). By its very nature, an improperly admitted extraneous offense tends to be harmful. It encourages a jury to base its decisions on character conformity, rather than evidence that the defendant committed the offense with which he or she has been charged.

The evidence that Jackson committed the Kroger robbery was overwhelming. Roberson provided detailed testimony concerning the Kroger robbery. Jackson had admitted committing the Kroger robbery to Blaylock. The shell casings collected at the scene of the Kroger robbery were fired from the pistol seized at Jackson's house. A hat recovered at the scene of the Kroger

robbery after being abandoned by the robbers had a mixture of DNA from three men on it. Jackson could not be excluded as a possible contributor of the DNA despite the fact that "99.98 percent of random unrelated individuals in the Caucasian, African-American, and Southwestern Hispanic populations" would be excluded as possible contributors. The overwhelming evidence of the Kroger robbery had enormous potential for confusing the jury and enormous potential to encourage the jury to base its decision on character conformity.

Our concerns about the nature of the erroneously admitted extraneous evidence are enhanced when the evidence is considered in connection with the other evidence in the case. Although evidence suggests Jackson committed the pawn shop robbery, it was not without contradiction. The evidence establishing identity consisted of mainly the shell casing found at Jackson's residence and the admissions Jackson made to Blaylock and Roberson. The credibility of both Blaylock and Roberson was challenged by Jackson. Blaylock admitted he had received the $20,000.00 reward and admitted he had previously lied under oath about his finances on an application for a court-appointed attorney. Roberson was Jackson's accomplice in the Kroger robbery. Jackson also argued that the shell found at Jackson's house during the third search may have been planted by an unknown third party.

The evidence of the Kroger robbery may have had a profound effect on the jury's decision concerning the credibility of Blaylock and Roberson. It is not our role to speculate as to whether the jury would have still believed Blaylock and Roberson. Credibility choices are the sole

province of the jury. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). Our role is to determine the "likelihood that the error materially affected the jury's deliberations." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001) (citing *Satterwhite v. Texas*, 486 U.S. 249 (1988)). The overwhelming evidence that Jackson committed the Kroger robbery may have quieted any lingering doubts the jury had concerning the credibility of Blaylock and Roberson. The extraneous-offense evidence may have had a significant influence on the jury when it was considering the credibility of the State's witnesses.

In considering how the erroneously admitted evidence might be considered in connection with other evidence in the case, the emphasis of the evidence by the State should be considered. *See Lajoie v. State*, 237 S.W.3d 345, 355 (Tex. App.—Fort Worth 2007, no pet.) (State's overt emphasis contributed to harm of admitting defendant's request for counsel); *see also McCarthy*, 65 S.W.3d at 55 (considering State's emphasis of error in assessing harm under Rule 44.2(a)). Unlike the erroneously admitted evidence in *Motilla*, the erroneously admitted evidence in this case is not innocuous and is not brief. The State's rebuttal consumed approximately forty percent of the trial—approximately two and a half days of a six-day trial, and the bulk of that occurring after a weekend break. The State called fifteen witnesses and introduced seventeen exhibits. The evidence linking Jackson to the Kroger robbery was considerably stronger than the evidence linking Jackson to the pawn shop murder. The State emphasized the extraneous offense during its closing argument and admitted it had "spent a significant time . . . talking about an extraneous

28

matter." Although the State generally referred to the extraneous offense when discussing identity and intent, the State deviated from these limitations on at least one occasion. The State argued Jackson would not have convinced Roberson to participate in the Kroger robbery "if Mr. Jackson isn't able to convince him that he's already gotten away with one." Although the State's emphasis was not as overt as the emphasis in *Lajoie*, it nonetheless affects whether the error resulted in harm.

As noted above, the evidence of guilt, while substantial, was not overwhelming. Even more important, the evidence of guilt was not free from contradictions. When the character of the erroneously admitted evidence and its connection to the other evidence is considered, we are unable to reach a fair assurance that the error did not influence the jury, or had but a slight effect. We conclude the trial error in admitting evidence concerning an extraneous offense—the Kroger robbery—resulted in reversible error. Because we have found the error in admitting the extraneous offense constitutes reversible error, it is unnecessary to address Jackson's remaining issues.

Although the evidence is legally and factually sufficient, admitting, over Jackson's objections, extensive evidence concerning the extraneous offense was error and was harmful. We reverse Jackson's conviction for capital murder and remand for a new trial.

Josh R. Morriss, III
Chief Justice

Date Submitted:     June 30, 2010
Date Decided:      August 12, 2010

Publish