**Affirmed and Memorandum Opinion filed December 22, 2011.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-00840-CR

---

**THOMAS DANIEL GUERRERO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 179th District Court
Harris County, Texas
Trial Court Cause No. 1255375**

---

## MEMORANDUM OPINION

A jury convicted appellant Thomas Daniel Guerrero of intentionally or knowingly causing serious bodily injury to a child, and it assessed punishment at fifty-five years' imprisonment. In three issues, appellant argues that the trial court erred by admitting evidence of certain extraneous bad acts, finding one of the State's experts qualified to testify about shaken baby syndrome, and reading certain testimony back to the jury during jury deliberations. We affirm.

BACKGROUND

While appellant was separated from his wife, Melissa Guerrero, he met and conceived a child with his girlfriend, Irene Ayala. In March 2006, Irene gave birth to the complainant, Lilah. Appellant had infrequent contact with Lilah until the fall of 2006 when he moved into Irene's apartment. At the time, Lilah was about eight months old, and appellant was again separated from his wife Melissa.

On November 9, 2006, Irene was at work while appellant stayed home to watch Lilah. Irene's other children were in daycare, so appellant and Lilah were alone. Evidence revealed that appellant spoke to Irene on the phone throughout the day, inquiring about lunch plans and letting Lilah hear Irene's voice. Evidence also revealed that appellant spoke with Melissa about getting a divorce and whether she would permit appellant to visit their daughter, Alora. At approximately 4:00 p.m. and while still caring for Lilah, appellant phoned Irene and told her to come to the apartment right away because Lilah had sustained injuries. Lilah died from those injuries several days later.

Appellant did not testify at trial, but he told a consistent story of what happened to Lilah to at least ten of the State's witnesses.[1] Appellant claimed that he put Lilah on a pillow sitting on the couch, and that Lilah fell off the couch and onto the carpeted floor when he went to the kitchen to cook some food. Appellant claimed to have found Lilah lying on her stomach with her hands beneath her and her head turned to the right; her eyes were "halfway open" and she was having difficulty breathing.

Appellant took Lilah to a neighbor's apartment and asked the neighbor to call 911. Appellant called Irene's mother and asked her to come lock the apartment because he was going to the hospital with Lilah and did not have a key. Irene's mother went to the apartment and found the door open and a stove burner on low. When Irene arrived at the

---

[1] These witnesses included Melissa, Irene, Irene's neighbor, Irene's mother, an emergency responder, a doctor, several police officers, a social worker, and a supervising investigator with the Texas Department of Family and Protective Services.

apartment to pick up Lilah's car seat and belongings before going to the hospital, Irene noted a forty-ounce bottle of beer open on the counter, which was full almost to the top.

The State presented evidence that Lilah previously had sustained virtually no injury when, while also in appellant's care, she fell onto carpet from a bed much higher than the couch. The State also presented evidence that appellant has a drinking problem and had become verbally abusive toward Melissa on one occasion after drinking alcohol and discussing Melissa's own extra-marital relationship; on that occasion, appellant had shaken Lilah's car seat in irritation in an effort to make her stop crying.

Other testimony painted appellant in a positive light. Irene testified that appellant was a good, patient, loving, and affectionate father-figure toward Lilah and Irene's other children. Irene also testified that she had not noticed appellant drinking any alcohol in the two weeks before Lilah's death. Irene's mother testified that appellant was a very polite, quiet, and respectful person, and she had never seen him get angry, use drugs or alcohol, or abuse children. Melissa testified that appellant was a loving and affectionate father for their daughter, and he was never mean to their daughter or struck or shook her. Appellant's sister testified that appellant often babysat for her children, and he was very affectionate towards them and never put them in harm's way. Appellant scolded his sister when she spanked her children. Finally, the jury heard evidence that appellant was distraught when Lilah showed signs of injury and died: he cried, attempted suicide, and admitted fault for leaving Lilah on the couch unsupervised.

Regarding Lilah's injuries and their cause, the State presented evidence from five doctors, all of whom the court found qualified to testify as experts over appellant's objections. Dr. Ana Lopez, an assistant medical examiner with the Harris County Institute of Forensic Sciences, performed an autopsy on Lilah. Dr. Lopez explained that Lilah suffered from subdural and subarachnoid hemorrhages, or bleeding in different parts of the outer layers of the brain. Lilah also showed retinal hemorrhages in both eyes. She developed swelling in her brain, and one side of her brain was pushed into the other.

3

Lilah finally had a stroke because her brain was not getting enough oxygen. Dr. Lopez opined that Lilah's injuries were caused by blunt impact to the head or acceleration/deceleration forces, which could include shaking. Dr. Lopez noted that Lilah had no external injuries except for a few pressure sores caused by lying in the hospital for several days, as well as several small, faint bruises on the right side of her head and the left side of her neck, which she opined could have been caused by I.V. lines or a cervical collar used on Lilah during hospitalization. Dr. Lopez further opined that Lilah's injuries were not consistent with a fall from a couch.

Dr. Rebecca Girardet, a medical doctor specializing in child abuse pediatrics, testified that she examined Lilah before her death. She opined that a 2.5-foot fall from a couch to a carpeted surface could not have caused Lilah's injuries. She believed that Lilah was shaken, and there may or may not have been an impact to her head. Dr. Girardet explained that the shaking required to cause brain trauma like Lilah suffered is severe, and not something that someone would do accidentally because anyone would recognize it as being harmful to a baby.

Dr. Judianne Kellaway, an ophthalmologist specializing in the retina, was consulted about Lilah's retinal hemorrhages. Dr. Kellaway testified that retinal hemorrhages can be caused by direct trauma to the eye or from shaking, but that retinal hemorrhages are rarely seen in babies because the elastic tissues that interface with the retina are "very tough" and more solid in a baby than in an adult or older child. Dr. Kellaway testified that "moderately severe" hemorrhaging in both retinas of a baby, as was present in Lila's case, suggests the baby was shaken. She explained that it takes a "tremendous" amount of force to cause these types of hemorrhages, and even babies who have been thrown from vehicles during car accidents, found unconscious with fractures and head injuries, did not develop retinal hemorrhages. Dr. Kellaway opined that a 2.5-foot fall from a couch could not have caused Lilah's injuries, and the only possible cause of Lilah's multiple injuries was shaking.

4

Dr. Alexander Simonetta, a neuroradiologist with training and experience in shaken baby syndrome, evaluated Lilah's CT scans. The CT scans and x-rays of Lilah did not reveal any fractures, but they revealed the subdural and subarachnoid hemorrhages and eventual brain death. Dr. Simonetta noted the lack of external swelling or injuries to Lilah and explained that the lack of such injuries, combined with bleeding in the brain, is indicative of child abuse—in particular, a shaking injury rather than a direct blow to the head. He testified it takes a "fair amount" of force to cause a subdural hemorrhage, and it was not possible for Lilah's injuries to be caused by falling from a couch.

Dr. Deborah Brown, a hematologist, testified that Lilah did not have a bleeding disorder and her injuries could not have been caused by a bleeding disorder. Dr. Brown concluded that Lilah's injuries were caused by some kind of significant blunt force trauma; she opined that Lilah's injuries were inconsistent with appellant's story that Lilah fell 2.5 feet from a couch and were consistent with shaken baby syndrome.

The jury convicted appellant of intentionally or knowingly causing serious bodily injury to a child, and assessed punishment at fifty-five years' imprisonment. In three issues on appeal, appellant argues that the trial court erred by (1) admitting evidence of certain extraneous bad acts; (2) finding Dr. Brown qualified to testify about shaken baby syndrome; and (3) reading back certain testimony from Dr. Kellaway to the jury during deliberations.

## ANALYSIS

### I.   Evidence of Extraneous Bad Acts

In his first issue, appellant argues that the trial court erred by admitting evidence of extraneous bad acts showing that (1) appellant has a drinking problem and shook Lilah's car seat in irritation after drinking alcohol on a prior occasion; and (2) drugs were found on several occasions in appellant's backpack.

5

Evidence of extraneous offenses or bad acts that a defendant may have committed ordinarily cannot be introduced at the guilt-innocence phase to show that the defendant acted in conformity with his criminal nature and therefore committed the crime for which he is on trial. *See* TEX. R. EVID. 404(b); *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002). This evidence, however, may be admissible when it is relevant to a "noncharacter conformity issue of consequence" in the case, such as the defendant's intent or defensive theories. *Robbins*, 88 S.W.3d at 259; *see also* TEX. R. EVID. 404(b) (evidence may be admissible to prove, among other things, motive, intent, and absence of mistake or accident). Evidence is relevant to such an issue if the purpose for which the party seeks to have it admitted tends to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Smith v. State*, 5 S.W.3d 673, 679 n.13 (Tex. Crim. App. 1999).

Evidence relevant to a "noncharacter conformity issue of consequence" under Rule 404(b) nonetheless may be inadmissible under Rule 403 if the trial court determines that the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice. TEX. R. EVID. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000) (citing *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g)). When conducting a Rule 403 balancing test, the trial court should analyze (1) how probative the evidence is; (2) the potential for the evidence to impress the jury in some irrational way; (3) the time the proponent will need to develop the evidence; and (4) the proponent's need for the evidence, *i.e.*, whether other evidence is available and whether the fact of consequence is related to a disputed issue. *Montgomery*, 810 S.W.2d at 389–90; *Isenhower v. State*, 261 S.W.3d 168, 177–78 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

6

Because the trial court is in the best position to decide these admissibility questions, an appellate court must review a trial court's admissibility decision under an abuse of discretion standard. *Robbins*, 88 S.W.3d at 259–60 (citing *Montgomery*, 810 S.W.2d at 391). We uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *Id*. at 260. An appellate court misapplies this standard of review if it reverses a trial court's admissibility decision simply because the appellate court disagrees with it. *Id*.

With these standards in mind, we turn to the evidence challenged by appellant on appeal.

### A.     Alcohol Use and Shaking of Car Seat

Melissa testified that appellant has had "a habit of drinking too much" and "a problem with drinking" for "quite some time." She testified that appellant regularly would drink beer all day when he was not working, from the time a store opened in the morning (or whenever he could buy beer) until the late evening. Melissa also testified about a trip to Galveston that she took with appellant, their daughter Alora, and Lilah. Melissa explained that appellant had been drinking alcohol before and throughout the trip, and he seemed intoxicated. Appellant became upset about Melissa's past marital indiscretion during the car ride home, and he began yelling obscenities at Melissa. Lilah was crying in her car seat, and appellant yelled at Lilah to "shut up." When Lilah continued to cry, appellant turned around and shook the car seat "like he was irritated." Melissa testified that appellant's shaking of the car seat "concerned [her]."

Appellant generally objected to this evidence on the grounds that (1) the evidence shows only bad character or reputation and therefore is prohibited by Rule 404(b); and (2) the evidence is more prejudicial than probative under Rule 403. The trial court admitted the evidence, but granted appellant a jury instruction and a running objection. We address separately each of appellant's arguments regarding this evidence.

### 1. Shaking of Car Seat

**Rule 404(b).** With respect to evidence that appellant shook Lilah's car seat, appellant argues more specifically on appeal that the evidence is not admissible under Rule 404(b) because appellant "never argued that he did not mean to shake the complainant" and that "the prior shaking does not establish that the injuries were not accidental, only that [appellant] shook the complainant before."

Appellant seems to argue that the questions of intent or accident are not "issues of consequence" under 404(b) because appellant's explanation for Lilah's injuries was that she fell from the couch, not that he accidentally shook her, or shook her without intending to cause any injury. We disagree that this is a meaningful distinction in this case. *See, e.g.*, *Robbins*, 88 S.W.3d at 261–62 (defendant claimed that infant's fatal asphyxiation injuries were caused by defendant's improperly performed CPR or, alternatively, sudden infant death syndrome; admitting evidence of prior injuries suffered by infant while in appellant's care because such evidence was relevant under Rule 404(b) to show intent or rebut either defensive theory); *Prieto v. State*, 879 S.W.2d 295, 298 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (defendant claimed that child's burns and bruises were caused when child fell while giving himself a bath; admitting evidence showing that on a prior occasion, defendant had yelled at child in abusive manner, threatened beating, and grabbed child roughly by the arm because such evidence was relevant to appellant's intent under 404(b)); *cf. Estelle v. McGuire*, 502 U.S. 62, 68–69 (1991) (in context of constitutional challenge to trial court's admission of evidence, noting that evidence of prior injury to child helps prove "that the child died at the hands of another and not by falling off a couch, for example; it also tends to establish that the 'other,' whoever it may be, inflicted the injuries intentionally"); *Robbins*, 88 S.W.3d 267–68 (Cochran, J., concurring) (discussing "doctrine of chances" and historic case of *Rex v. Smith*, 11 Cr. App. R. 229, 84 L.J.K.B. 2153 (1915), in which evidence that Smith's two prior wives were found drowned in bath tubs was held admissible; "[t]he

8

evidence was not offered to prove that Mr. Smith had a 'drowning' or 'murderous' character trait, but to show that it was more likely that [the third wife] died from a criminal act [rather than an accident] because two of Mr. Smith's other brides had died under very similar circumstances").

We cannot say that the trial court abused its discretion in deciding that the evidence was relevant to a "noncharacter conformity issue of consequence" in this case, such as appellant's intent or his defensive theory that Lilah's injuries were caused by falling from the couch while appellant was out of the room. *See* TEX. R. EVID. 404(b); *Robbins*, 88 S.W.3d at 259–60. We overrule appellant's issue based on this argument.

**Rule 403.** Appellant also argues that even if such evidence is admissible under 404(b), it should have been excluded under Rule 403 because "it did not resemble the degree or type of shaking that was alleged was necessary to cause the injuries."[2] This argument relates to the probative value of the evidence, which is one of the four factors, discussed above, that are germane to our analysis under Rule 403. The probative value is "often, although by no means invariably, a function of the similarity of the extraneous transaction to the charged offense." *Montgomery*, 810 S.W.2d at 389–90. We do not agree with appellant that his shaking of Lilah's car seat, while under the influence of alcohol and having a heated discussion about his relationship with Melissa, is so dissimilar to weigh in favor of inadmissibility under Rule 403 simply because appellant did not shake Lilah vigorously enough to cause fatal injury.

With respect to the remaining Rule 403 factors, we note that (1) it is unlikely that the jury could have irrationally relied on this evidence to convict appellant for shaking Lilah's car seat, especially when there is no evidence that shaking the car seat injured Lilah; (2) it took the State very little time to develop this evidence; and (3) there was no other compelling or undisputed evidence upon which the State could have relied to show

---

[2] Appellant also argues that it constitutes evidence of appellant's "drunk temper, which evokes a strong negative emotional response." We address this argument below in the context of appellant's alcohol use.

9

that appellant had acted aggressively toward Lilah before.[3] *See Montgomery*, 810 S.W.2d at 389–90; *Isenhower*, 261 S.W.3d at 177–78. These factors do not weigh in favor of finding that the probative value of the evidence is "substantially outweighed" by its potential for prejudice, and we conclude that the trial court acted within its discretion in admitting the evidence. *See* TEX. R. EVID. 403; *Robbins*, 88 S.W.3d at 259–60. We overrule appellant's issue based on this argument.

### 2. Alcohol Use

**Rule 404(b).** With respect to the evidence of appellant's habitual alcohol use, appellant argues on appeal that the evidence is inadmissible under Rule 404(b) because the State cannot establish its theory that appellant "was angry and got drunk" on the day of Lilah's injury by introducing evidence that appellant "would wake up and drink in the morning and until he went to bed."

The State consistently argued that the evidence of appellant's drinking habit established a "pattern of behavior." This argument fairly raises the application of Texas Rule of Evidence 406.[4] *See* TEX. R. EVID. 406. Rule 406 states: "Evidence of the habit of a person . . . is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit . . . ." *Id.* Evidence of habit and character sometimes appear similar; but while character is a generalized description of a person's

---

[3] Appellant argues that the State's need for this evidence was slight because "there was testimony of five experts that said he shook the baby to death," and that Lilah's injuries could not have been caused by falling from the couch. While the expert testimony was compelling, the applicability of the shaken baby syndrome theory to this case was consistently disputed by appellant at trial. *See Montgomery*, 810 S.W.2d at 390 ("When the proponent has other compelling or undisputed evidence to establish the proposition or fact that the extraneous misconduct goes to prove, the misconduct evidence will weigh far less than it otherwise might in the probative-versus-prejudicial balance.").

[4] Moreover, a trial court's evidentiary ruling must be upheld "if it is correct under any theory of law that finds support in the record." *See, e.g.*, *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006) (citing *McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997), and *Romero v. State*, 800 S.W.2d 539, 543–44 (Tex. Crim. App. 1990)). This is so even when the State did not raise the ground for upholding the ruling in the trial court. *See, e.g.*, *Rhodes v. State*, 945 S.W.2d 115, 118 n.3 & 119 (Tex. Crim. App. 1997) (affirming and noting that court of appeals concluded that trial court's denial of motion to suppress could be affirmed based on same theory of law applicable to case but not argued by State to trial court).

disposition, habit describes a person's regular response to a repeated specific situation. *Reyes v. Mo. Pac. R.R. Co.*, 589 F.2d 791, 794 (5th Cir. 1979).[5] Controlling admissibility considerations include the adequacy of sampling and uniformity of response. *Id.* at 795. "[T]he probative force of habit evidence to prove intoxication on a given occasion depends on the degree of regularity of the practice and its coincidence with the occasion." *Id.*; *see Haynes v. State*, 85 S.W.3d 855, 858–59 (Tex. App.—Waco 2002, pet. ref'd) (noting that "Rule 406 allows for evidence of a 'habit' if relevant, as Haynes's drinking habit was here," but overruling appellant's issue regarding admissibility of evidence showing drinking "habit" because such evidence was admitted elsewhere at trial without objection).

Rather than challenging these considerations with respect to Melissa's testimony, appellant argues, without citation to supporting authority, that the trial court erred in admitting the testimony because the State presented no evidence that appellant was intoxicated on the day of Lilah's injury. Appellant seems to implicitly reference the old rule that if there is some evidence that a party was intoxicated at the time of the incident in question, only then may such evidence be corroborated by habit evidence showing that the party was frequently or habitually drunk. *See, e.g.*, *Compton v. Jay*, 389 S.W.2d 639, 642 (Tex. 1965); *R.T. Herrin Petroleum Transp. Co. v. Proctor*, 338 S.W.2d 422, 431 (Tex. 1960); *but see* TEX. R. EVID. 406 (evidence of habit admissible "whether corroborated or not"); 64 A.L.R. 567 § 28 (4th ed. Supp. 2011) ("The phrase 'whether corroborated or not' has been held to eliminate prior law requirement that there be evidence that the person acted in conformity with the habit or routine practice on the particular occasion in suit.").

---

[5] Authorities discussing Federal Rule of Evidence 406 are persuasive in our application of the equivalent Texas rule. *See Bishop v. State*, 837 S.W.2d 431, 435 (Tex. App.—Beaumont 1992), *aff'd*, 869 S.W.2d 342 (Tex. Crim. App. 1993) (relying on "federal case law dealing with an identical provision in the Federal Rules of Evidence," and noting that the court's research "turned up no Texas cases in which Rule 406 was significantly discussed"); *compare* FED. R. EVID. 406 *with* TEX. R. EVID. 406.

11

Even if appellant's argument were relevant under some other applicable theory, we disagree that there is "simply no evidence that [appellant] was intoxicated" on the day of Lilah's injury. While there is no direct evidence showing intoxication because appellant was alone with Lilah, there is circumstantial evidence that appellant was under the influence of alcohol. Specifically, Irene found a forty-ounce bottle of beer on the counter when she returned to her apartment on the day Lilah went to the hospital; she explained that it was "still up to the top" and "just like a little bit off of it." Irene denied having any beer in the home when she left for work that morning. Irene testified that appellant had no money because he was not working at the time, but that she confronted appellant the same day about money that had gone missing from her bank account after she had allowed him to use her debit card. Evidence from a neighbor indicates that appellant left the apartment with Lilah in a stroller at some point during the morning, and Irene testified that appellant would take Lilah in the stroller when he wanted to go to the store next to the apartments. Thus, there is evidence that appellant purchased and opened at least one beer on the day Lilah was injured. We conclude that this evidence brings the admissibility of appellant's drinking "habit" within the zone of reasonable disagreement. *See* TEX. R. EVID. 404(b); *Robbins*, 88 S.W.3d at 259–60. We overrule appellant's issue based on this argument.

With respect to evidence of appellant's angry and aggressive behavior while discussing his relationship with Melissa under the influence of alcohol, we also conclude that such evidence was admissible under Rule 404(b) to show, among other things, appellant's intent, state of mind, or motive. Melissa's testimony regarding the Galveston trip demonstrated that appellant acted uncharacteristically angry and aggressive when discussing the infidelity issue under the influence of alcohol; she testified that she had never seen him so angry before. Additionally, Melissa testified without objection about an instance that occurred a few months later when she was lying in bed with appellant, who had been drinking. Melissa concluded that appellant was asleep and had just closed

12

her own eyes when appellant reached over "and grabbed for [Melissa's] neck" and said, "I don't trust you anymore."

The evidence showed that while appellant was caring for Lilah on the day she was injured, appellant spoke with Melissa and Irene over the phone about getting a divorce from Melissa. Appellant also spoke with Melissa about whether she would permit him to see their daughter, Alora; Melissa informed appellant that he could come see Alora at Melissa's home, but she did not want him taking Alora until he had a "stable place" to live. Melissa testified: "He got real upset when I told him that. . . . He was angry. He didn't like for anyone to dictate to him when or where he could see Alora." This evidence, along with admissible evidence showing that appellant may have been under the influence of alcohol, creates a picture of the circumstances under which appellant was caring for Lilah.[6] We conclude that this evidence brings the admissibility of appellant's behavior while under the influence of alcohol within the zone of reasonable disagreement. *See* TEX. R. EVID. 404(b); *Robbins*, 88 S.W.3d at 259–60. We overrule appellant's issue based on these arguments.

**Rule 403.** Appellant argues that even if such evidence is admissible under Rule 404(b), it should have been excluded under Rule 403 because it "left the indelible impression that [appellant] was always drunk, even though [Melissa] was often not around him." Appellant also argues that it constitutes evidence of appellant's "drunk temper, which evokes a strong negative emotional response."[7]

---

[6] Although appellant argues that the evidence of appellant's behavior while under the influence of alcohol is not relevant to prove motive because "the evidence did not show that Lelah [sic] did anything that would have caused him to intentionally injure [her] that day," we think the circumstantial evidence described above is more than sufficient. Additionally, we note that the probative value of this evidence for permissible Rule 404(b) purposes is enhanced by the fact that appellant lied to a Texas Department of Family Protective Services investigator, who asked the "standard question" about his use of alcohol that day. Appellant denied any such use and stated that "the only mistake he made was by setting [Lilah] on the couch."

[7] Appellant also argues that "the extraneous evidence that [appellant] was intoxicated and was driving was not probative and extremely prejudicial." Melissa did not testify about who drove to Galveston; she testified that she "knew [she] had to drive home" from Galveston and that she "was

The evidence of appellant's alcohol use and behavior while under the influence of alcohol is extremely probative to show, among other things, appellant's intent, state of mind, or motive on the day Lilah suffered injury. This is especially so in light of other evidence that appellant was a patient caretaker when not under the influence of alcohol or discussing his troubled relationship with Melissa. Moreover, it is not likely that the jury irrationally relied on the evidence to convict appellant for having a "drunk temper," rather than for causing serious bodily injury to a child. Although the State spent a great deal of time developing the evidence, the State's need for such evidence to explain appellant's actions weighs in favor of admissibility. Based on these considerations, we conclude that the trial court acted within its discretion in admitting the evidence. *See* TEX. R. EVID. 403; *Robbins*, 88 S.W.3d at 259–60; *see also Montgomery*, 810 S.W.2d at 389–90; *Isenhower*, 261 S.W.3d at 177–78. We overrule appellant's issue based on this argument.

## B.   Drugs

Melissa also testified that her grandmother "found drugs in [appellant's] backpack on more than one occasion." Appellant complains that the trial court erroneously admitted this evidence over appellant's objection. Assuming without deciding that the admission of such evidence was error, we conclude that appellant was not harmed.

In conducting a harm analysis for non-constitutional errors, our objective is to determine whether the admission of the evidence had an effect on appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005) (reviewing erroneous admission of evidence for non-constitutional harm under Rule 44.2(b)). Pursuant to Texas Rule of Appellate Procedure Rule 44.2(b), any non-constitutional error that does not affect appellant's substantial rights must be disregarded. *Haley*, 173 S.W.3d at 518. A substantial right is affected when the error

already driving" when the argument occurred. Melissa testified on cross-examination that "I don't recall if he [shook the car seat] while he was driving . . . or if this was when I was driving." The record does not reflect that the jury heard any evidence that appellant drove while intoxicated.

14

had a substantial and injurious effect or influence in determining the jury's verdict. *Id*. In assessing the likelihood that the jury's decision was adversely affected by the error, an appellate court should consider everything in the record, including (1) any testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) whether the State emphasized the error; (5) the jury instructions; (6) the parties' theories; and (7) jury arguments and voir dire, if necessary. *Id*. at 518–19.

We agree with appellant that the character of the alleged error generally weighs in favor of finding harm. *See Jackson v. State*, 320 S.W.3d 873, 889 (Tex. App.—Texarkana 2010, no pet.) ("By its very nature, an improperly admitted extraneous offense tends to be harmful."). However, Melissa's statement that her grandmother "found drugs in [appellant's] backpack on more than one occasion" was unlikely to distract the jury from the extensive admissible evidence presented by both parties over the course of approximately three days. The State presented testimony from fifteen witnesses and proffered thirty-nine exhibits. The State did not ask any follow-up questions in response to Melissa's statement about the drugs in appellant's backpack but instead moved on to other topics related to the State's theory that appellant intentionally injured Lilah while under the influence of alcohol—not drugs. The State did not emphasize the error or otherwise raise the issue again in questioning or closing arguments. Having reviewed the entire record, we conclude that the alleged error did not have a substantial and injurious effect or influence in determining the jury's verdict. *See* TEX. R. APP. P. 44.2(b); *Haley*, 173 S.W.3d at 518–19.

We overrule appellant's first issue.

## II. Expert Witness Qualification

In his second issue, appellant argues that the trial court erred by concluding that Dr. Brown was qualified to opine that Lilah's injuries were consistent with shaken baby

15

syndrome. The State responds that any error in qualifying Dr. Brown to testify about shaken baby syndrome was harmless.

A witness is qualified to testify as an expert if the witness has sufficient background—knowledge, skill, experience, training, or education—in a particular field that "goes to the very matter on which the witness is to give an opinion." *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (quotation omitted); *see also* TEX. R. EVID. 702 (testimony of experts). The focus is on the "fit" between the subject matter at issue and the expert's familiarity therewith. *Vela*, 209 S.W.3d at 133. For example, a licensed medical doctor may be an expert in a particular field, but the doctor is not automatically qualified to testify as an expert on every medical question. *Id*. at 132. The doctor's background must "fit" with the specific issue before the court. *See id*. at 132–33.

We review a trial court's decision to admit expert testimony for an abuse of discretion. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Turner v. State*, 252 S.W.3d 571, 584 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)). The proponent of expert testimony bears the burden of proving that the expert is qualified to testify.[8] *Id*.

The trial court held a hearing outside the jury's presence to allow the State an opportunity to establish Dr. Brown's knowledge, skill, experience, training, and education. Dr. Brown testified that she is a pediatric hematologist, is board certified in pediatrics and pediatric hematology-oncology, and has fifteen years experience in the field. She explained that hematology is the study of blood disorders, and she described the tests that she ran on Lilah's blood to determine if Lilah had a blood disorder.

Appellant objected to Dr. Brown testifying in support of a theory based on shaken baby syndrome, and the court overruled the objection. Dr. Brown eventually testified in

---

[8] The proponent must also prove that the expert's testimony is reliable and relevant. *See Vela*, 209 S.W.3d at 131. Appellant does not challenge the trial court's findings on these elements.

16

front of the jury that Lilah's injuries must have been caused by significant blunt force trauma because Lilah did not have any bleeding disorders that would explain those injuries. She opined further that Lilah's injuries were not consistent with a 2.5-foot fall from a couch but were consistent with shaken baby syndrome.

Appellant did not, and does not now, challenge Dr. Brown's qualifications to opine that Lilah did not have a blood disorder, or that this fact meant Lilah's injuries must have been caused by trauma. But the State presented no evidence during the hearing about Dr. Brown's knowledge, skill, experience, training, or education to "fit" the opinion that Lilah's injuries were consistent with shaking rather than some other trauma. Thus, the State failed to meet its burden, and the trial court should have limited Dr. Brown's testimony to the subject matter for which she was qualified—namely, diagnosing blood disorders and the lack thereof. *See, e.g.*, *Croft v. State*, 148 S.W.3d 533, 541–42 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (finding no abuse of discretion when trial court limited expert's testimony about a medical device to two specific topics tailored to expert's actual qualifications).

However, we conclude that the trial court's error in admitting Brown's testimony about shaken baby syndrome was harmless. We must disregard a non-constitutional error that does not affect a substantial right. TEX. R. APP. P. 44.2(b); *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (analyzing erroneous admission of expert testimony for non-constitutional harm under Rule 44.2(b)). As we have already explained, a substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble*, 330 S.W.3d at 280. But if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless. *Id.* In analyzing the erroneous admission of expert testimony, we may consider, among other things: (1) the strength of the evidence of the appellant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or

17

weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during arguments. *See id.* at 286–88.

The evidence of appellant's guilt was strong, in particular, because four experts other than Dr. Brown reached the same conclusion: Lilah's injuries were caused by shaking and not a short fall from a couch. Further, Dr. Brown effectively refuted her own opinion during cross-examination and redirect when she repeatedly testified, "I don't consider myself an expert in Shaken Baby Syndrome," and "I'm not an expert in that field, no." Finally, in closing argument the State referenced Dr. Brown's testimony on the subject of bleeding disorders only and did not mention her opinion that Lilah's injuries were the result of shaking. Instead, the State specifically identified the other doctors who reached those conclusions.

After reviewing the record as a whole, we have a fair assurance that the improperly admitted evidence did not influence the jury or had but a slight effect upon the verdict. *See Coble*, 330 S.W.3d at 280. Thus, we conclude that the error was harmless.

We overrule appellant's second issue.

## III. Jury Deliberations

In his third issue, appellant argues that the trial court erred when it granted the jury's request to read back Dr. Kellaway's testimony "about the amount of force required to inflict the injuries sustained by Lila [sic] Guerrero" because "the jury did not specify that there was a dispute" about the testimony.

Texas Code of Criminal Procedure article 36.28 states that "if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other." TEX. CODE CRIM. PROC. ANN. art. 36.28 (West 2006). When

the jury asks for testimony to be read back, the trial court must first determine whether the jury's inquiry is proper. *Brown v. State*, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994). "A simple request for testimony does not, by itself, reflect disagreement, implicit or express" and is not a proper request under article 36.28. *Howell v. State*, 175 S.W.3d 786, 790 (Tex. Crim. App. 2005). But a trial court may infer a disagreement if there is some basis "other than mere speculation" to support the court's finding. *Id*. at 792; *see also Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994). We review the trial court's conclusion as to whether there is a disagreement for an abuse of discretion. *Howell*, 175 S.W.3d at 790.

Appellant acknowledges in his brief that he objected to the trial court's reading of Dr. Kellaway's testimony on the grounds that the jury's request was not specific enough.[9] However, appellant did not object on the grounds that the jury failed to certify that it was in dispute about the requested testimony. Accordingly, appellant has failed to preserve this issue for our review. *See* TEX. R. APP. P. 33.1; *Boatwright v. State*, 933 S.W.2d 309, 310–11 (Tex. App.—Houston [14th Dist.] 1996, no pet.) (appellant must preserve error regarding trial court's reading of testimony to jury). We overrule appellant's issue based on this argument.

Appellant argues briefly on appeal that the trial court erred in reading back Dr. Kellaway's testimony that it would take a "tremendous force" to cause a retinal hemorrhage in a baby because "the jury was not specific enough in its request." Neither appellant's issue as stated nor the authorities cited by appellant in support of that issue concern the question of whether the requests were specific enough; appellant's issue and authorities concern the question of whether the jury was in dispute, an argument we

---

[9] Appellant objected that "we had sent a note back to [the jury] asking them to be more specific as to the question of force, what they meant by force. We have not received yet from them a specific enough question as to what they're asking about. . . . [T]hey never came back to specify what they meant by force. So, therefore, until we have a clear question on that, I am objecting to the readback—to the proposed readback of Dr. Kellaway. . . . My objection continues that the requests are not specific enough to what is disputed; and second, they have not defined what the amount of force is."

19

already have overruled. Even if we read appellant's issue as encompassing an additional complaint regarding specificity, we do not agree with appellant that the trial court abused its discretion in concluding that the jury's request to hear testimony from Dr. Kellaway "about the amount of force required to inflict the injuries sustained by Lila [sic] Guerrero" was specific enough. *See Howell*, 175 S.W.3d at 792 (appellate courts should not disturb a trial court's decision under article 36.28 "unless a clear abuse of discretion and harm is shown"). We overrule appellant's issue based on this argument.

Appellant also argues briefly that the jury's lack of specificity resulted in "harm" to appellant because the jury also requested Dr. Simonetta's testimony "about the amount of force required to inflict the injuries sustained by Lila [sic] Guerrero," but the trial court failed to read back responsive testimony from Dr. Simonetta.

After the court reporter searched for testimony responsive to the jury's requests, the parties acknowledged that the court reporter could not find a statement by Dr. Simonetta regarding "the amount of force required to inflict the injuries sustained by Lila [sic] Guerrero." The trial court read back the requested testimony from Dr. Kellaway and explained: "Ladies and gentlemen, that's all we have for you at this time." In fact, Dr. Simonetta testified that "it takes a fair amount of force" to cause a subdural hemorrhage.[10] Appellant argues that the failure to read this testimony constitutes a "comment on the weight of the evidence" because Dr. Simonetta's testimony was "contrary" to Dr. Kellaway's testimony that it would take a "tremendous force" to cause a retinal hemorrhage in a baby.

Aside from arguing that this failure is the "harm" attributable to the jury's lack of specificity in its request, appellant does not complain on appeal that the trial court erred in reading back some but not all the testimony responsive to the jury's requests, nor does

---

[10] Defense counsel explained to the trial court: "In reference to Dr. Simonetta, my recollection is that he said it was an unknown amount of force. If that is there, then I think that has to be read back to the jury if we are allowing the readback of Dr. Kellaway. . . . I believe he said it was an unknown force." The trial court noted, "[Y]ou are the only one that remembers that."

20

he cite to authority regarding such a complaint. Even if we read appellant's brief as raising this issue, we conclude that any alleged error did not harm appellant.

After concluding that a jury's request is proper, a trial court must interpret the communication, decide what testimony will best answer the inquiry, and limit the reading accordingly. *Brown*, 870 S.W.2d at 55; *Fox v. State*, 283 S.W.3d 85, 89 (Tex. App.— Houston [14th Dist.] 2009, pet. ref'd). If the court limits the reading to some but not all of the testimony that is responsive to the jury's request, and the reading is a harmful comment on the evidence, we must reverse. *See Fox*, 283 S.W.3d at 90–91 (holding that trial court erred by reading back some but not all testimony responsive to jury's request, and that error was harmful); *Megason v. State*, 19 S.W.3d 883, 889–90 (Tex. App.— Texarkana 2000, pet. ref'd) (holding that trial court erred by reading back some but not all testimony responsive to jury's request, but reading was not harmful because omitted testimony "would not be of significance in the outcome of the case"); *see also Robison*, 888 S.W.2d at 480 (noting that one concern in answering jury questions is that trial court will comment on evidence). We review a trial court's determination about the scope of the testimony read to the jury for an abuse of discretion. *Brown*, 870 S.W.2d at 55; *Fox*, 283 S.W.3d at 89.

Assuming without deciding that the trial court erred, we must disregard this non-constitutional error if we have a fair assurance after reviewing the record that the error did not influence the jury or had but a slight effect upon the verdict. *See* TEX. R. APP. P. 44.2(b); *Fox*, 283 S.W.3d at 91 (analyzing error of reading back some but not all responsive testimony for non-constitutional harm under Rule 44.2(b)). In *Fox*, the jury requested a reading of the direct examination of the complaining witness's description of the crime. *Id*. at 89. The defendant requested that the cross-examination testimony on the same subject be read as well, but the trial court only ordered the direct examination testimony read to the jury. *Id*. at 90. This court found error and reasoned that the error was harmful because (1) the testimony during cross-examination contradicted the same

21

witness's testimony during direct examination; and (2) the witness's testimony was highly probative of the defendant's guilt, and therefore the witness's credibility was vital to the jury's decision. *Id*. at 91.

Dr. Simonetta testified about the amount of force necessary to cause a *subdural* hemorrhage while Dr. Kellaway testified about the force necessary to cause a *retinal* hemorrhage. Thus, we disagree with appellant that Dr. Simonetta's testimony was "contrary" to Dr. Kellaway's testimony. Dr. Kellaway's conclusion that Lilah's retinal hemorrhage was caused by "tremendous force" would not have been undercut by Dr. Simonetta's testimony that the subdural hemorrhage was caused by "a fair amount of force." After reviewing the entire record, we have a fair assurance that the error did not influence the jury or had but a slight effect. *See Fox*, 283 S.W.3d at 90–91. We overrule appellant's issue based on this argument.

Accordingly, we overrule appellant's third issue.

### CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.


/s/     Sharon McCally
         Justice


Panel consists of Justices Brown, Boyce, and McCally.

Do Not Publish — TEX. R. APP. P. 47.2(b).

22