

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00227-CR

JEREMY ALLEN JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 1323358

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

## MEMORANDUM OPINION

Jeremy Allen Johnson appeals his conviction of possession of a controlled substance in an amount greater than four grams but less than 200 grams[1] with a deadly-weapon finding, for which Johnson was sentenced to sixty years' incarceration. We affirm the judgment of the trial court because (1) the trial court properly exercised its discretion in denying Johnson's motion to suppress, (2) the trial court correctly denied Johnson's request for a jury instruction under Article 38.23(a) of the Texas Code of Criminal Procedure, (3) the trial court's improper admission of evidence related to Johnson's status as a parolee was harmless error, (4) Johnson's Oregon penitentiary packet (pen pack) was properly admitted in the punishment phase of trial, (5) legally sufficient evidence supports the jury's guilty verdict, and (6) legally sufficient evidence supports the jury's deadly-weapon finding.

## I. Background

When the Hopkins County Sheriff's Office received a telephone call from Steven Coursey reporting that a tan 2004 Cadillac sedan with license plate number BN4V7110 was occupied by three white males and carrying a firearm and narcotics in the area near Highway 1567 and Highway 11 East, Deputy Dennis Findley, among others, was dispatched to the area. Unable to locate the suspicious vehicle in the identified area, Findley personally called Coursey, who advised that the vehicle might be located at 1429 Church Street in Sulphur Springs. Coursey explained that the narcotics and gun were located in the trunk of the vehicle.

---

[1]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(d) (West 2010). The punishment range for this second degree felony offense was enhanced as a result of two prior felony convictions. *See* TEX. CODE CRIM. PROC. ANN. § 12.42(d) (West Supp. 2014).

On learning this information, Findley drove to the Church Street address, but did not locate the vehicle. Findley then received a call from a fellow deputy that the suspicious vehicle was traveling on Pipeline Road. Findley soon spotted the vehicle at the corner of Pipeline Road and North Jackson Street, and he saw the vehicle head north on North Jackson Street towards Church Street. As the vehicle approached the intersection of Church Street and North Jackson Street, Findley observed the vehicle roll through the stop sign and continue north on Church Street. At that point, Findley activated the lights and siren on his patrol car. The tan Cadillac, which matched Coursey's description, pulled into the driveway of 1429 Church Street.

Based on the information that the vehicle was carrying a gun and narcotics, a felony traffic stop was initiated. Findley and his fellow officers at the location exercised extreme caution by approaching the vehicle with their service weapons drawn in a ready position. Robin Breckenridge, Johnson's mother and the driver of the tan Cadillac, was removed and handcuffed together with Johnson, who had been seated in the front passenger seat, and Brent Pelky, who had been seated in the back passenger seat.

When Findley removed Pelky from the back passenger seat of the car, he immediately noticed a "gun rug"—a pouch used for housing a gun—which confirmed the information he received from dispatch and from Coursey that a firearm was in the vehicle. After obtaining what he believed to be Breckenridge's consent to search the vehicle, Findley asked Ryan Haley, a K-9 handler for the Texas Department of Public Safety (DPS), to "run his dog" on the car.[2] Thereafter, officers conducted a manual search of the vehicle, which uncovered

[2]The K-9 alerted to the presence of narcotics on the driver's side door.

3

methamphetamine and a .38 caliber handgun, both of which were concealed on opposite sides in the vehicle's trunk.

## II.    The Trial Court Properly Denied Johnson's Motion to Suppress

Johnson filed a pretrial motion to suppress all tangible evidence seized and statements taken in connection with his detention and arrest, claiming such evidence was obtained without a warrant, probable cause, or other lawful authority in violation of Article 38.22 of the Texas Code of Criminal Procedure; the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and Article I, Sections 9, 10, and 19 of the Texas Constitution.  The trial court overruled the motion to suppress, concluding that Findley's observation of the vehicle failing to completely stop at a designated stop sign constituted reasonable suspicion for the traffic stop. Additionally, the trial court found that the driver of the vehicle consented to the search.[3]

### A.    Standard of Review

We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard. *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd).  Because the trial court is the exclusive trier of fact and judge of witness credibility at a suppression hearing, we afford almost total deference to its determination of facts supported by the record. *State v. Ross*, 32 S.W.3d 853, 856–57 (Tex. Crim. App. 2000); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

---

[3]In a letter ruling on Johnson's motion to suppress, the trial court found (1) that the traffic stop was initiated as a result of Findley observing the vehicle fail to completely stop at a stop sign, (2) that the driver gave consent to search the vehicle, and (3) that the use of the K-9, in tandem with (1) and (2), established probable cause to search the vehicle.

4

We afford the same deference to a trial court's rulings on mixed questions of law and fact if the resolution of those questions turns on an evaluation of credibility and demeanor. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). We review de novo the trial court's application of the law and determination of questions not turning on credibility. *Carmouche*, 10 S.W.3d at 332; *Guzman*, 955 S.W.2d at 89. Since all the evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of Johnson's motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case. *See Carmouche*, 10 S.W.3d at 327; *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).

## B.     Legality of the Traffic Stop

A routine traffic stop implicates both the United States and Texas Constitutions and, under both, must be reasonable. *Berkemer v. McCarty*, 468 U.S. 420, 436–37 (1984); *Earl v. State*, 362 S.W.3d 801, 802 n.2 (Tex. App.—Texarkana 2012, pet. ref'd); *see* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. Law enforcement officers may stop and briefly detain individuals suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). To validly initiate an investigative stop, an officer must possess a reasonable suspicion based on specific, articulable facts that, in light of the officer's experience and general knowledge, would lead the officer to reasonably conclude the person detained actually is, has been, or soon will be engaged in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 9–10 (1989); *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001); *Zervos v. State*, 15 S.W.3d 146, 151 (Tex. App.—Texarkana

5

2000, pet. ref'd). This is an objective standard that disregards any subjective intent of the officer making the stop. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). The facts used to support the investigative stop must support more than a mere hunch or suspicion. *Cullum v. State*, 270 S.W.3d 583, 584–85 (Tex. Crim. App. 2008).

In this case, the State argued that Findley had reasonable suspicion to stop the Cadillac because he witnessed a violation of Section 544.010 of the Texas Transportation Code. *See* TEX. TRANSP. CODE ANN. § 544.010 (West 2011) (requiring driver to bring vehicle to complete stop at stop sign). "If an officer has a reasonable basis for suspecting that a person has committed a traffic offense, the officer may legally initiate a traffic stop." *Graves*, 307 S.W.3d at 489.

Here, the evidence presented at the suppression hearing demonstrated Findley's reasonable suspicion that the vehicle failed to come to a complete stop at the stop sign located at the intersection of Church Street and North Jackson Street. Findley testified that the vehicle "turned north on Jackson headed toward Church Street, at which time the vehicle slowed to -- at the stop sign and then proceeded on through without coming to a complete stop." Findley testified that he "could clearly see that the vehicle rolled through the stop sign [and] never came to a complete stop" and that he initiated the traffic stop "based on seeing this violation."[4]

Viewing the evidence in a light most favorable to the trial court's ruling, we find that Findley had a reasonable basis for suspecting a violation of Section 544.010 of the Texas Transportation Code, and therefore, a valid basis for initiating an investigative stop. *See* TEX. TRANSP. CODE ANN. § 544.010. After Findley initiated the stop, Breckenridge presumably gave

---

[4]Although Findley testified about the information received from Coursey, at the suppression hearing, the State relied on the observed violation of the Texas Transportation Code to justify the stop.

6

the officers permission to search the vehicle, which ultimately led to discovery of the contraband.[5] Johnson claims Breckenridge never gave the officers consent to search the vehicle.

## C.     The Search

Although the parties address this issue in terms of whether Breckenridge consented to the search of the vehicle,[6] we are obligated to uphold the trial court's ruling on the motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case.  *See Ross*, 32 S.W.3d at 856; *Carmouche*, 10 S.W.3d at 327; *State v. Williams*, 275 S.W.3d 533, 536 (Tex. App.—Texarkana 2008, no pet.).  Without addressing the issue of consent, we conclude that the officers had probable cause to search the vehicle.

The officers were informed that narcotics and a gun were located in the trunk of the vehicle.  A gun rug was located in the rear passenger compartment where Pelky had been sitting.  After this discovery, Findley spoke with Breckenridge and believed he had Breckenridge's consent to search the vehicle.  No search was conducted, though, until after a K-9 conducted an open-air sniff of the vehicle and alerted to the presence of narcotics.[7]  Thereafter, the officers searched the vehicle and discovered a gun and some methamphetamine concealed in the trunk.

The law is well established that a K-9's detection of the presence of drugs in a vehicle constitutes probable cause and validates a warrantless search of that vehicle.  *Taylor v. State*, 410

---

[5]During an investigative detention, a detainee can give and an officer can accept consent to search a vehicle. *State v. Williams*, 275 S.W.3d 533, 536 (Tex. App.—Texarkana 2008, no pet.).

[6]The issue of consent was contested and is not entirely clear cut.

[7]DPS K-9 Officer Billy Ryan Haley, together with his K-9 partner, arrived at the scene almost simultaneously with the stop of the vehicle.  As a result, Johnson's detention was not prolonged by waiting for the arrival of the K-9 unit. The dog started its "pass" at the front left bumper and moved down the outside of the vehicle when it alerted and attempted to jump into the vehicle window while scratching and biting at the doorpost.  Thereafter, the dog and officers searched the vehicle.

S.W.3d 520, 528 (Tex. App.—Amarillo 2013, no pet.); *Branch v. State*, 335 S.W.3d 893, 901 (Tex. App.—Austin 2011, pet. ref'd); *Haas v. State*, 172 S.W.3d 42, 54 (Tex. App.—Waco 2005, pet. ref'd); *see Parker v. State*, 182 S.W.3d 923, 924 (Tex. Crim. App. 2006). "Probable cause to search exists when there is a 'fair probability' of finding inculpatory evidence at the location being searched. If this exception applies, then the police may search 'every part of the vehicle and its contents that may conceal the object of the search.'" *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)). Thus, when the dog alerted on the vehicle in this case, the officers at the scene had probable cause to conduct a warrantless search of the vehicle. We overrule this point of error.

## III.    No Error in Denying Article 38.23 Instruction

Johnson next claims that the trial court erred in refusing to instruct the jury pursuant to Article 38.23 of the Texas Code of Criminal Procedure, because there was a factual dispute as to (1) whether Findley had reasonable suspicion to stop the vehicle and (2) whether Breckenridge consented to a search of the vehicle. We find that the trial court did not err in denying the requested instruction.

### A.    Applicable Law

Article 38.23 of the Texas Code of Criminal Procedure states,

> (a)    No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence

8

was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005).

An Article 38.23 instruction is mandatory when there is a factual dispute regarding the legality of the search. *Brooks v. State*, 642 S.W.2d 791, 799 (Tex. Crim. App. [Panel Op.] 1982); *Malone v. State*, 163 S.W.3d 785, 802 (Tex. App.—Texarkana 2005, pet. ref'd). To show entitlement to an Article 38.23 instruction, a defendant must establish (1) that the evidence heard by the jury raised a fact issue, (2) that the evidence related to that fact is affirmatively contested, and (3) that the contested fact issue is material to the lawfulness of the challenged conduct through which the evidence was obtained. *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). "[I]f other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence." *Id*.

**B.      Analysis**

**1.      Reasonable Suspicion for the Traffic Stop**

At the hearing on the motion to suppress and, again, at trial, Findley testified that he stopped the vehicle because he observed it fail to come to a complete stop at a stop sign. The issue of whether there was a failure to stop was affirmatively contested before the jury through conflicting testimony offered by Findley, on one hand, and Breckenridge, on the other. In the absence of other, uncontested evidence sufficient to support the lawfulness of the traffic stop, Johnson would be entitled to an Article 38.23 instruction on the lawfulness of the challenged conduct.

9

Here, however, Breckenridge's purported failure to stop at the stop sign was not the only justification for the traffic stop.  The evidence at trial showed that Findley received information from dispatch provided by Coursey, Johnson's co-worker.  Findley learned from dispatch that Coursey described the suspect vehicle as a tan 2004 Cadillac.  Coursey also provided the vehicle's license plate number, advised that there were three white males in the vehicle, and stated that a gun and narcotics were located in the vehicle.  After searching approximately twenty minutes for the vehicle in the area identified by Coursey, Findley called Coursey for further information.  From this conversation, Findley learned that Coursey personally observed what he believed to be a controlled substance in the trunk of the Cadillac while at Summit Energy, where both Coursey and Johnson worked.  Coursey indicated that he was offered a chance to purchase some of this substance and indicated that the Cadillac might be found on Church Street, where Johnson lived.

This evidence indicates that Findley was provided specific facts regarding the type of criminal activity involved, the description of the suspect vehicle, the vehicle's route of travel, and the location of the suspected narcotics and the firearm.  Based on its determination that the foregoing facts established reasonable suspicion to stop the Cadillac, separate and apart from Breckenridge's alleged violation of a traffic law, the trial court concluded that Johnson was not entitled to an Article 38.23 instruction.[8]

Reasonable suspicion to conduct an investigative stop has been found on similar facts. For example, in *Matthews v. State*, 431 S.W.3d 596 (Tex. Crim. App. 2014), law enforcement

---

[8]The trial court made detailed findings in support of its decision to disallow an Article 38.23 instruction.

officers responded to an anonymous 9-1-1 call reporting that a black male was selling "crack" out of a white van parked in front of a food store on Hattie Street. The caller described what the alleged drug dealer was wearing and gave his name. The officers responded to the call, located the white van, and observed a black male matching the anonymous caller's description and who identified himself as Cornelius Matthews. Matthews, who refused to show the officers his left hand, was removed from the van and frisked. *Id*. at 600.

Matthews challenged the propriety of the initial detention and frisk. *Id.* at 602. The Texas Court of Criminal Appeals determined that the totality of the circumstances established reasonable suspicion to support the scope and duration of the officers' investigatory detention, noting that the detention was not based solely on the anonymous 9-1-1 call. *Id.* at 605. In addition, the Court of Criminal Appeals observed that the detention was based on the following facts: (1) Matthews was located in a high-crime area late at night, (2) Matthews was dressed as the 9-1-1 caller had described, (3) Matthews' name was correctly identified by the 9-1-1 caller, (4) Matthews was sitting in the driver's seat of a van matching the description provided by the 9-1-1 caller, and (5) Matthews refused to comply with the officers' request to show both of his hands and did so in a suspicious manner. *Id*.

Here, the initial call was not anonymous. The caller identified himself as Stephen Coursey. The information provided by Coursey was detailed and fact-specific; he described the car and its contents, provided the license plate number, and identified the number of people in the vehicle. Coursey indicated that he saw what he believed to be illegal drugs and a gun in the trunk of the car and provided the car's route of travel and likely location. As in *Matthews*, the tip

11

here contains indicia of reliability. Moreover, Coursey confirmed the information during a telephone conversation with Findley. Findley located the vehicle en route to Johnson's home on Church Street, as Coursey had indicated. When Findley spotted the vehicle, he could discern three occupants, as Coursey had described.[9]

The evidence on which the trial court relied in finding that reasonable suspicion supported the traffic stop, excepting Breckenridge's alleged failure to come to a complete stop at a stop sign, is uncontested. Thus, under *Madden*, the contested fact issue of whether Breckenridge came to a complete stop at the stop sign is immaterial to the challenged conduct of executing an investigatory detention. *See Madden*, 242 S.W.3d at 510. Here, the totality of the circumstances, viewed through an objective lens, demonstrates that Findley had reasonable suspicion for the investigative detention.

### 2. Probable Cause to Search the Vehicle

Johnson next argues that an Article 38.23 instruction should have been included in the charge because there was a disputed fact issue regarding Breckenridge's purported consent to a search of the vehicle. This argument is based on the conflicting testimony offered by Breckenridge and Findley regarding consent.[10]

---

[9] Coursey indicated that there were three males in the car. Although Findley initially observed three occupants in the vehicle, he later realized that the driver was a female. As noted by the trial court, even if Findley or other officers were aware that some of the occupants may have exited the car and then re-entered it, there was no testimony that either the drugs or the gun were ever removed from the trunk, where Coursey said they were hidden.

[10] The State maintains that this issue was not preserved for appeal because Johnson failed to object to the omission of an Article 38.23 instruction based on the consent issue. Indeed, the record indicates that, during an informal discussion of this issue prior to the formal charge conference, the court noted that Johnson requested an Article 38.23 instruction with regard to whether there was consent to search the vehicle. The court indicated that the request was denied because "the totality of the circumstances would show that there was probable cause to search the vehicle anyway." Johnson objected, stating that "there is evidence that raises a valid issue -- factual issue as to whether or not the mother of the defendant, Mrs. Breckenridge, consented to the search and that the jury should be

12

Even assuming that the aforementioned facts did not amount to probable cause to search the vehicle, probable cause for a warrantless search was clearly established, as discussed previously, by the K-9's positive alert for the presence of contraband in the vehicle.

Because the issue of Breckenridge's consent to search the vehicle is immaterial to the challenged conduct of searching the vehicle, the trial court correctly decided that an Article 38.23 instruction was not warranted on the contested issue of consent. *See Madden*, 242 S.W.3d at 510.

## IV. Improper Admission of Evidence of Johnson's Parole Status Was Harmless Error

### A. The Parole Status Evidence Was Inadmissible

Johnson's girlfriend, Sarah Shirley, testified that the narcotics the officers discovered in the vehicle belonged to her. In light of this testimony, the State sought to elicit testimony from Shirley regarding her knowledge of the fact that Johnson was on parole in two different states. The State sought to elicit such testimony to impeach Shirley's testimony and to expose her motive for testifying that the drugs belonged to her. Johnson's objection that the admission of evidence regarding his parole status was irrelevant and prejudicial was overruled. On appeal, Johnson contends the trial court erred in admitting this evidence.[11] We agree.[12]

---

allowed to make a determination in that regard . . . ." The following day, at the formal charge conference, Johnson's sole objection to the lack of an Article 38.23 instruction was based on the disputed fact issue of whether Breckenridge came to a complete stop at the stop sign.

Harm from a charge error, including the failure to include an Article 38.23 instruction, is evaluated under *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). *Atkinson v. State*, 923 S.W.2d 21, 27 (Tex. Crim. App. 1996). Because we find no error in the trial court's ruling on this issue, we need not apply the *Almanza* analysis. *Almanza*, 686 S.W.2d at 171; *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (in review of alleged jury charge error, first determination is whether charge contains error).

[11]The State contends this issue was not preserved for appeal. Johnson timely objected to the admission of testimony regarding Shirley's knowledge of Johnson's parole status. The State concedes that there is no question that Johnson

13

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion when its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.*

The trial court ruled that the testimony regarding Johnson's parole state was admissible under Rule 404(b) of the Texas Rules of Evidence to expose Shirley's motive for testifying. *See* TEX. R. EVID. 404(b). Rule 404(b) renders inadmissible evidence of the defendant's "other crimes, wrongs, or acts" designed to show that the defendant committed the crime charged in the indictment, but allows the admission of such evidence to prove the defendant's motive to commit the crime, among other things. TEX. R. EVID. 404(b); *see, e.g.*, *Knox v. State*, 934 S.W.2d 678, 683 (Tex. Crim. App. 1996); *Lopez v. State*, 288 S.W.3d 148, 165 (Tex. App.—Corpus Christi 2009, pet. ref'd); *Massey v. State*, 826 S.W.2d 655, 658 (Tex. App.—Waco 1992, no pet.); *Peterson v. State*, 836 S.W.2d 760, 762–63 (Tex. App.—El Paso 1992, pet. ref'd); *see also Hines v. State*, 269 S.W.3d 209, 214 (Tex. App.—Texarkana 2008, pet. ref'd).

In *Hines*, the State elicited testimony from the defendant's wife—for the proffered purpose of impugning her credibility—that the defendant had previously been imprisoned. *Hines*, 269 S.W.3d at 214. In recognizing that the trial court correctly found that this evidence

objected to the admission of such testimony. The State argues that, when Johnson's request for a limiting instruction was granted, error was not preserved when Johnson failed to move for a mistrial. The only essential requirement to ensure preservation is a timely, specific request that is refused by the trial court. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *Kay v. State*, 340 S.W.3d 470, 473 (Tex. App.—Texarkana 2011, no pet.); *see also* TEX. R. APP. P. 33.1(a). Here, such a request was made and refused. Error was preserved.

[12]Here, the State established that Shirley previously worked in a prison, understood how the parole process worked, and knew that Johnson was "on parole out of two states." The State further established that Shirley knew Johnson faced serious repercussions if convicted. We believe this testimony effectively notified the jury that Johnson had been previously convicted of criminal offenses.

was "incredibly prejudicial" and "absolutely objectionable," we rejected the State's purported justification for offering the evidence. We stated,

> The State attempts to justify the introduction of Hines's prior penitentiary stay by relying on the statement in *Moreno v. State*, 22 S.W.3d 482, 485–86 (Tex. Crim. App. 1999), that even "unadjudicated crimes could be admissible to show a witness's bias or interest in the particular case." However, *Moreno* is easily distinguished because although the witness being impeached was the defendant himself, he had chosen to testify. Here, Hines had not testified and, indeed, never testified in his own behalf during the guilt phase of the trial.

*Id.* We further stated,

> "The general rule in all English speaking jurisdictions is that an accused is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The rule is now deemed axiomatic and is followed in all jurisdictions." *Young v. State*, 159 Tex. Crim. 164, 261 S.W.2d 836, 837 (1953).

*Id.* Here, the trial court admitted the evidence regarding Johnson's parole status to prove Shirley's motive for testifying, not for the purpose of proving any motive on Johnson's part. Further, Johnson had not testified and never did testify on his own behalf during the guilt phase of the trial. The testimony here, as in *Hines*, was not admissible for any purpose, and its admission was error. *See Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (if extraneous offense evidence has no relevance apart from character conformity, then evidence absolutely inadmissible under Rule 404(b)); *Hines*, 269 S.W.3d at 214; *see also* TEX. R. EVID. 404(b).[13]

---

[13]Because we conclude this evidence is inadmissible under Rule 404(b) of the Texas Rules of Evidence, we need not analyze its admissibility under Rule 403. TEX. R. EVID. 403, 404(b).

## B.     Harm Analysis

Having determined that the evidence was erroneously admitted, we must now decide whether its admission was so harmful as to require a new trial. The erroneous admission of an extraneous offense does not constitute constitutional error. *Higginbotham v. State*, 356 S.W.3d 584, 592 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007)). Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that an appellate court must disregard a nonconstitutional error that does not affect a criminal defendant's substantial rights. TEX. R. APP. P. 44.2(b). An error affects a substantial right of the defendant when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Nonconstitutional error is not grounds for reversal if, "'after examining the record as a whole,'" there is "'fair assurance that the error did not influence the jury, or had but a slight effect.'" *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

In assessing the likelihood that the jury's decision was adversely affected by the error, we "'consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case.'" *Motilla*, 78 S.W.3d at 357 (quoting *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)).

The State argues that the trial court "appropriately gave a limiting instruction at the time the evidence was admitted"[14] and further notes that a written limiting instruction was included in the court's charge. These instructions advised the jury that the evidence regarding Johnson's parole status could only be considered for proof of motive of the testifying witness, and for no other purpose. This Court addressed a similar argument in *Jackson v. State*, 320 S.W.3d 873, 888 (Tex. App.—Texarkana 2010, pet. ref'd). In *Jackson*, the State introduced what was ultimately determined to be inadmissible extraneous-offense evidence. *Id*. at 887. In analyzing the resulting harm, we concluded that the trial court's limiting instruction did not render the error harmless:

> As discussed above, the Kroger robbery should not have been admitted to prove either identity or intent in the pawn shop murder. Thus, the limiting instruction instructed the jury it could consider, albeit for a limited purpose, evidence it should not have considered. An instruction, which instructs a jury to consider inadmissible evidence for a limited purpose, still instructs a jury to consider inadmissible evidence. The evidence should not have been considered for any purpose during the guilt/innocence phase of the trial. The limiting instruction does not render the error harmless.

*Id*. at 888. Applying *Jackson*'s reasoning to the facts presented here, the limiting instruction did nothing to ameliorate any harm caused by the error in admitting the evidence of Johnson's parole status.

We may also consider, in conducting a harm analysis, the presence of overwhelming evidence of guilt. *Motilla*, 78 S.W.3d at 357 ("[O]ur conclusion . . . that overwhelming evidence of guilt is a factor to be considered . . . applies to harm analysis conducted under the current

---

[14]While this argument was made in support of the State's claim of admissibility, it is more appropriately addressed in our analysis of harm.

17

rules."). In this case, Findley was advised by dispatch, and then directly by Coursey, that Johnson was carrying drugs and a gun in the trunk of his Cadillac on the day of Johnson's arrest. Coursey testified that he worked with Johnson at Summit Energy in Como for two or three months. Coursey and Johnson worked in a barn located in a pasture that passed as a paint shop. Coursey explained that he was on community supervision and was "just tired of being around all the dope." So, on the day of Johnson's arrest, he called the sheriff's office to tell them Johnson had a large quantity of narcotics that day, as well as a gun. According to Coursey, Johnson, Johnson's brother Michael, and Pelky, who also worked at Summit, would bring methamphetamine to work every day where they would smoke it and sell it to "people who would pull up at the shop." On the day he called the sheriff's office, Coursey was offered a chance to purchase some of the methamphetamine, which was located in the vehicle's trunk. At trial, Coursey identified a photograph of the .38 caliber handgun that he saw in Johnson's car at work.

Findley located Johnson's vehicle in the area described by Coursey and, on searching the car, found methamphetamine and a .38 caliber handgun in the trunk in accordance with Coursey's description of their location. Photographs of Johnson were discovered on a cell phone found in the car, one of which was saved under the description "me" in the phone's contacts list. This same phone contained pictures of a Dallas Cowboys money clip and a black headband around another large sum of money. The cash discovered on Johnson at the time of his arrest was packaged in the same manner as the money depicted on the cell phone. Another photograph saved on the cell phone depicted a digital scale and a substance described as methamphetamine.

18

The digital scale in the photograph was the same brand as the scale found with the methamphetamine in the trunk of Johnson's car at the time of his arrest.

This evidence, standing alone, is substantial and compelling evidence of Johnson's guilt. The sole evidence that the drugs did not belong to Johnson came from Shirley, who testified that she lived with Johnson and hid the methamphetamine in the trunk of the Cadillac for her own use. Although Shirley told Findley on the day of Johnson's arrest that the methamphetamine was hers, she could not tell Findley where the drugs were located because, according to her, she was high. Shirley explained that, because she was no longer employed and could not afford health insurance, she was using the methamphetamine to self-medicate for anxiety. Shirley also admitted to having a conversation with Johnson, after his arrest, in which he told her to say the drugs were hers. At one point during her testimony, Shirley claimed methamphetamine she disposed of inside of the house belonged to Pelky. Shirley then testified that the drugs belonged to her. Shirley admitted to being untruthful on the witness stand.

The trial court, addressing Johnson during the punishment phase and expressing concern and dismay regarding Shirley's testimony, stated,

> And, in fact, the idea that you would allow Ms. Shirley to get on that stand and do what she did -- the reality is, there probably isn't anybody on planet earth that believed for a moment that those were hers and you had no knowledge of them. There's probably nobody on planet earth that believed that, that she clearly was taking the fall for you. And that's disturbing.

The trial court's assessment of Shirley's testimony as incredible is telling. We do not believe this evidence does anything to counteract the strength of the State's evidence of Johnson's guilt. The compelling nature of the evidence of guilt weighs in favor of a finding that the trial court's

19

erroneous admission of testimony regarding Johnson's parole status did not influence the jury, but this is not the sole factor in our analysis.

In addition to evidence of guilt, we are to assess "'the character of the alleged error and how it might be considered in connection with other evidence in the case.'" *Motilla*, 78 S.W.3d at 357 (quoting *Morales*, 32 S.W.3d at 867). Here, the character of the evidence of Johnson's parole status weighs in favor of a finding of harm. "By its very nature, an improperly admitted extraneous offense tends to be harmful. It encourages a jury to base its decisions on character conformity, rather than evidence that the defendant committed the offense with which he or she has been charged." *Jackson*, 320 S.W.3d at 889.

In considering how the erroneously admitted evidence might be considered in connection with other evidence in the case, the emphasis by the State should be considered. *Id.* at 890. The State's emphasis of the testimony that Johnson was a parolee was minimal, and when considered in connection with the other evidence, this testimony was very brief. Shirley's testimony regarding Johnson's parole status consisted of only twenty-two lines in a multi-volume record. *Compare DeLeon v. State*, 77 S.W.3d 300, 316 (Tex. App.—Austin 2001, pet. ref'd) (finding admission of extraneous-offense evidence harmful where "[m]ore time was spent developing the extraneous wrongdoing than proving the ultimate issues alleged in the indictment"). The State never inquired into the underlying facts concerning the conduct that resulted in Johnson's parole. Johnson's parole status was mentioned on two occasions during closing argument. The first such

20

mention was made by defense counsel.[15]  Likewise, the State mentioned Johnson's parole status only once in closing argument.[16]

Because the trial court overruled Johnson's objection, no instruction to disregard was given by the trial court to alleviate any harm.  Nevertheless, the bulk of the testimony at trial concerned Johnson's alleged possession of methamphetamine, not his status as a parolee.  While the character of the evidence regarding Johnson's parole weighs in favor of a finding of harm, the remaining factors favor a finding that the error did not result in harm.  Given the relatively modest, unembellished testimony on this issue and the overwhelming evidence of Johnson's guilt, we have a fair assurance that the error did not influence the jury or had but a slight effect in its determination that Johnson was guilty of the charged offense.

## V.      Oregon Penitentiary Packet Was Properly Admitted

During the punishment phase of the trial, the State introduced an Oregon pen pack relating to Johnson that included a 1997 Marion County, Oregon, judgment of conviction for being a felon in possession of a firearm.  The State's authenticating witness testified that the state identification numbers (SID) from the Oregon pen pack and Johnson's fingerprint card from the State of Oregon were the same.  Johnson objected to the admissibility of the pen pack on the basis that the number identified by the authenticating witness as the SID number on the fingerprint card was not labeled as an SID number.  The trial court overruled the objection stating that the lack of an SID number goes to the weight of the evidence, not its admissibility.

---

[15]Counsel told the jury, "[I]f you folks are going to find my client guilty because he's got a tattoo or because he, as you now know, is on parole, then I might as well sit down right now and you might as well not have taken an oath."

[16]The State told the jury that Shirley's sole motivation in testifying was "to protect this guy right here because he's on parole."

21

On appeal, Johnson claims the trial court erred in admitting the pen pack because it was not properly authenticated.

During the punishment phase of trial, a court may admit evidence of prior criminal convictions. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2014). In order to establish that a defendant has been convicted of a previous offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists and (2) the defendant is linked to the conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). There is no specific document or mode of proof required to prove these two elements. *Id.* Rather, the State may use "[a]ny type of evidence, documentary or testimonial[,]" to make its proof. *Id.* at 922. The trier of fact looks at the totality of the admitted evidence to determine if these two elements were proven beyond a reasonable doubt. *Id.* at 923.

David Gilmore, a detective sergeant with the Sulphur Springs Police Department and a certified fingerprint examiner in the State of Texas, identified the Oregon pen pack as a file copy from Marion County, Oregon, that included a judgment reflecting Johnson's conviction of felon in possession of a firearm.[17] The felony guidelines sentencing report executed in connection with Johnson's Oregon conviction, also included in the pen pack, reflects an SID number of 11654911. Gilmore identified State's Exhibit 40 as an Oregon fingerprint card containing Johnson's fingerprints.[18] Gilmore also testified that he fingerprinted Johnson and matched those prints to the prints on the Oregon fingerprint card identified as those of Jeremy A. Johnson. The

---

[17] The pen pack was certified by the trial court administrator of the Circuit Court of Marion County, Oregon.

[18] The Oregon fingerprint card was certified by the legal keeper of records for the Oregon State Police.

22

Oregon fingerprint card was signed by Johnson and included a number in the upper left-hand corner identified by Gilmore as Johnson's Oregon SID number. This number—11654911—appears where the SID is normally located.

The testimony establishes that each of these numbers is Johnson's Oregon SID number. Both the felony guidelines sentencing report executed in connection with the Oregon judgment and the Oregon fingerprint card identify the offender listed in the judgment and the person whose prints appear on the fingerprint card as Jeremy A. Johnson. Likewise, each reflects a birthdate of January 30, 1977. The trial court did not err in overruling the objection. We overrule this point of error.

## VI.    Legally Sufficient Evidence Supports the Conviction

In his two final points of error, Johnson claims the evidence was not sufficient to prove he possessed a controlled substance or to support a deadly-weapon finding.[19]

### A.    Standard of Review

In evaluating legal sufficiency in this case, we must review all the evidence in the light most favorable to the jury's verdict and its deadly-weapon finding to determine whether any rational jury could have found the essential elements of each beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*,

---

[19]Johnson couches these points of error in terms of the "great weight and sufficiency of the evidence." Johnson's contention that his conviction was based on the "law of the parties" is erroneous. The court's charge did not instruct the jury on the law of the parties.

323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

### B. Possession of a Controlled Substance

Johnson argues that there was no evidence that he was ever in exclusive possession of the controlled substance.[20] It was not, however, incumbent on the State to prove exclusive possession. Instead, the State was required to prove that Johnson exercised control, custody, management, or care over the controlled substance and that he knew the matter possessed was contraband. *See Blackman v. State*, 350 S.W.3d 588, 596 (Tex. Crim. App. 2011); *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006); *see also* TEX. PENAL CODE ANN. § 1.07(a)(39) (West Supp. 2014). "Mere presence at the location where drugs are found is . . . insufficient, by itself, to establish actual care, custody, or control of those drugs." *Evans*, 202

---

[20]The remainder of Johnson's argument on this issue relates to the law of the parties. Because Johnson was not tried on this theory, we do not address his arguments relating to the law of the parties.

24

S.W.3d at 162. Presence or proximity to drugs, however, when combined with other direct or circumstantial evidence, may be sufficient to establish control, management, custody, or care if the proof amounts to more than a strong suspicion or probability. *Id.* "The 'affirmative links rule' is designed to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs." *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005).

The links in the following nonexclusive list have been recognized as relevant to a person's possession of contraband:

> (1) the contraband was in plain view or recovered from an enclosed place; (2) the accused was the owner of the premises or the place where the contraband was found; (3) the accused was found with a large amount of cash; (4) the contraband was conveniently accessible to the accused; (5) the contraband was found in close proximity to the accused; (6) a strong residual odor of the contraband was present; (7) the accused possessed other contraband when arrested; (8) paraphernalia to use the contraband was in view, or found on the accused; (9) the physical condition of the accused indicated recent consumption of the contraband in question; (10) conduct by the accused indicated a consciousness of guilt; (11) the accused attempted to flee; (12) the accused made furtive gestures; (13) the accused had a special connection to the contraband; (14) the occupants of the premises gave conflicting statements about relevant matters; (15) the accused made incriminating statements connecting himself or herself to the contraband; (16) the quantity of the contraband; and (17) the accused was observed in a suspicious area under suspicious circumstances.

*Muckleroy v. State*, 206 S.W.3d 746, 748 n.4 (Tex. App.—Texarkana 2006, pet. ref'd). The number of links present is not as important as the degree to which they tend to link the defendant to the controlled substance. *Taylor v. State*, 106 S.W.3d 827, 831 (Tex. App.—Dallas 2003, no pet.). In other words, we ask if there is evidence of circumstances, in addition to mere presence, that adequately justifies the conclusion that the defendant knowingly possessed the substance.

25

*Evans*, 202 S.W.3d at 162 n.9; *Washington v. State*, 215 S.W.3d 551, 554–56 (Tex. App.—Texarkana 2007, no pet.).

Here, the contraband was discovered hidden in the trunk of Johnson's car. This was the same car described by Johnson's co-worker, Coursey, who testified at trial that he saw large quantities of methamphetamine and a gun in the trunk of Johnson's car at Summit Energy. Coursey testified that Johnson, Johnson's brother Michael, and Pelky sold the drugs while at work.

When Johnson was arrested, a large quantity of cash—$6,500.00—was discovered on his person. The search of the vehicle also uncovered two cell phones on the front passenger seat. Johnson identified one of the cell phones as belonging to him, but denied ownership of the second cell phone. Because the second cell phone was unclaimed, Officer Brad Cummings checked the phone's contact list in an attempt to identify its owner. On doing so, Cummings located a number of incriminating photographs, described previously, including pictures of cash in a Dallas Cowboys money clip, and another sum of money bound by a black headband. The cash discovered on Johnson was packaged in the same manner as the money depicted on the cell phone. The money clip depicted in the photograph appeared to be the same Dallas Cowboys money clip found on Johnson at the time of his arrest. One photograph depicted a digital scale with a $100.00 bill on top with a large piece of what appeared to be crystal methamphetamine. This scale was the same brand as the one confiscated at the scene of the arrests.

These links have a strong tendency to connect Johnson to the contraband. Johnson was arrested with a large amount of cash on his person, and a large amount of contraband was

concealed in the trunk of his car. Johnson was seen at work earlier that day with narcotics in the trunk of his car. Photographs on a cell phone saved under a contact labeled "me" with Johnson's picture beside it also tend to connect Johnson to the contraband. These photographs depict a digital scale, cash, a substance described as methamphetamine, and a Dallas Cowboys money clip like the one Johnson was carrying when he was arrested. A rational juror could have concluded that Johnson exercised control, custody, management, or care over the narcotics and that he knew the matter possessed was contraband. We overrule this point of error.

### C.    Deadly-Weapon Finding

A deadly-weapon finding is proper if a deadly weapon "was used or exhibited during the commission of a felony offense or during immediate flight therefrom." TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2) (West Supp. 2014). It is undisputed that a deadly weapon, namely, a firearm, was discovered during the search of Johnson's car. *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West Supp. 2014). Thus, "we must determine whether a rational trier of fact could have found beyond a reasonable doubt that [a]ppellant used [a firearm] to facilitate" possession of the narcotics. *Coleman v. State*, 145 S.W.3d 649, 652 (Tex. Crim. App. 2004).

The term "use," in the context of a deadly-weapon finding, means "'any employment of a deadly weapon, even simple possession, if such possession facilitates the associated felony.'" *Id*. (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)). The question we must resolve is whether the gun discovered in the trunk of Johnson's car facilitated Johnson's possession of the narcotics also found in the trunk of the car. *See Coleman*, 145 S.W.3d at 655.

27

Factors we may consider in determining the sufficiency of the evidence to support a deadly-weapon finding include (1) the type of gun involved and whether it was loaded, (2) whether the gun was stolen, (3) the gun's proximity to drugs or drug paraphernalia, (4) the gun's accessibility to whomever controls the premises, (5) the quantity of drugs involved, and (6) any evidence that might show an alternative purpose for the gun's presence. *Id.* at 659–60 (Cochran, J., concurring); *Bahr v. State*, 295 S.W.3d 701, 709 (Tex. App.—Amarillo 2009, pet. ref'd) (reciting *Coleman* factors).

As applied to the facts of this case, the foregoing analysis demonstrates that (1) the .38 caliber handgun was hidden in the trunk of Johnson's car, (2) the gun was loaded with five live rounds of ammunition, (3) the gun was located close to a large quantity of narcotics, also located in the car's trunk, and (4) there is no evidence which might show an alternative purpose for the gun's presence.

Indeed, it is commonly recognized that narcotics dealers often possess firearms for the purpose of protecting themselves because they possess large amounts of drugs and cash. *See, e.g.*, *Moreno v. State*, 978 S.W.2d 285, 289 (Tex. App.—Fort Worth 1998, no pet.); *see also Dimas v. State*, 987 S.W.2d 152, 154 (Tex. App.—Fort Worth 1999, pet. ref'd) (narcotics supervisor testified drug dealers customarily possess firearms and use them to protect themselves, their drugs, and their money); *Wilson v. State*, 132 S.W.3d 695, 698 (Tex. App.—Amarillo 2004, pet. ref'd) (recognizing association between weapons and drug trade as "rather settled"). In this case, Cummings testified that firearms are commonly found with narcotics.

28

Viewing the evidence in the light most favorable to the jury's findings and considering all the relevant factors, we conclude that a fact finder could rationally determine that Johnson used the .38 caliber handgun to protect his drugs and, hence, to facilitate his possession of the narcotics. We, therefore, hold that the evidence is sufficient to support the jury's affirmative deadly-weapon finding, and we overrule this point of error.

## VII. Conclusion

We affirm the trial court's judgment.

Jack Carter
Justice

Date Submitted: July 21, 2014
Date Decided: September 22, 2014

Do Not Publish

29